703 So.2d 465 (1997)
Stuart Leslie POMERANZ, Appellant,
v.
STATE of Florida, Appellee.
No. 82467.
Supreme Court of Florida.
December 24, 1997.
*466 Richard L. Jorandby, Public Defender and Richard B. Greene, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, for Appellant.
Robert A. Butterworth, Attorney General and Celia A. Terenzio, Assistant Attorney General, West Palm Beach, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Stuart Leslie Pomeranz. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
On April 19, 1992, Pomeranz and Lyndon Kinser robbed the A & M Discount Beverage Store, located in Martin County, Florida. Kinser waited in the car while Pomeranz *467 went into the store and pulled a gun on the cashier, Ranjit Patel. Patel tried to grab the gun and Pomeranz shot him three times. Pomeranz then went behind the counter and shot Patel two more times at close range while Patel lay collapsed on the floor. Pomeranz grabbed $51, fled the store, and dove into the front passenger window of the car as Kinser drove by.
Kinser, the State's main witness against Pomeranz, pled guilty to first-degree murder and received a life sentence without possibility of parole for twenty-five years. At trial, Pomeranz's defense counsel argued that it was Kinser who committed the murder. The jury found Pomeranz guilty of first-degree murder and robbery with a firearm. At the sentencing phase, the jury recommended a life sentence for Pomeranz by a vote of eight to four. The trial court overrode the jury's recommendation and imposed the death penalty on Pomeranz for the murder of Patel and imposed a consecutive life sentence for the armed robbery.
In its sentencing order, the trial court found that the following aggravators applied to Pomeranz: (1) a previous conviction for a violent felony based on a prior armed robbery conviction; (2) the murder was committed during the commission of a robbery and the murder was committed for pecuniary gain (combined as one aggravator); (3) the murder was committed for the purpose of avoiding or preventing a lawful arrest; and (4) the murder was committed in a cold, calculated, and premeditated manner without pretense of legal or moral justification. The trial court also found that the following non-statutory mitigators applied: (1) Pomeranz was a good nephew and son; (2) Pomeranz could have been mentally abused by his stepfather; (3) Pomeranz could have been neurologically misdiagnosed as a child; and (4) Pomeranz had displayed behavior that could be more akin to one of less maturity than his chronological age. However, the trial court concluded that none of these mitigating factors could reasonably tip the scales against the aggravators that applied to the case and that when the aggravators and mitigators were weighed in a reasoned and deliberate process, any reasonable person using this weighing process could not conclude that there were any reasonably convincing mitigators established that outweighed the aggravating circumstances.

The Guilt Phase
Pomeranz raises seventeen guilt-phase issues in this appeal, only seven of which require discussion.[1] We first address Pomeranz's claim that the trial court erred in excluding a prior inconsistent statement made by Kinser during a prior trial for a May 1, 1992, robbery committed by Kinser and Pomeranz. Pomeranz contends that Kinser committed perjury when he testified at the trial of the case at bar that he and Pomeranz had planned the May 1 robbery on the day it was committed. At the trial for the May 1 robbery, Kinser had testified differently, stating that the robbery had been planned about a week or so before it was actually committed. When Pomeranz attempted to use this prior inconsistent statement to impeach Kinser, the trial court found that the defense had committed a discovery violation in failing to notify the State that it intended to use Kinser's prior testimony and thus ruled that the prior statement could not be used as impeachment evidence.
*468 Pomeranz asserts that he had no duty to notify the State of the impeachment evidence because the same state attorney's office conducted both the trial for the May 1 robbery and the trial below and that the State was therefore already in possession of Kinser's prior inconsistent testimony. Pomeranz contends that the outcome of the trial below possibly might have been different if the jury had known that Kinser had lied either to it or to the jury in the robbery trial.
Without addressing the merits of this issue, we hold that if error was committed by the trial court, it was harmless beyond a reasonable doubt. The question of whether the May 1 robbery was planned in advance or on the same day that it was committed was immaterial to the issue of Pomeranz's guilt in the instant case. In light of all of the other extensive impeachment testimony heard by the jury regarding Kinser's credibility problems, including his extensive criminal record, his involvement with Patel's murder, and his $3000 a week cocaine habit, there is no reasonable probability that not allowing the jury to hear Kinser's inconsistent testimony regarding the May 1 robbery contributed to the verdict. See State v. Di-Guilio, 491 So.2d 1129, 1135 (Fla.1986).
Pomeranz next claims that the trial court conducted an inadequate Richardson[2] hearing and improperly allowed the State to use prior deposition testimony to impeach a court witness. The State moved to have Elizabeth Hernandez Calderone called as a court witness because she had given numerous inconsistent statements regarding what she witnessed at the A & M Discount Beverage Store on the night of the murder.[3] During the State's questioning of Calderone at the trial below, she testified that she saw Pomeranz next to a telephone outside the A & M Discount Beverage Store and Kinser inside the store on the night of the murder. However, in a deposition conducted by Kinser's attorney prior to Pomeranz being charged with Patel's murder, Calderone had stated that it was Pomeranz she saw in the store that night. The State used this prior deposition testimony to impeach Calderone's testimony at trial.
Pomeranz asserts that the State committed a discovery violation when it failed to provide him with a copy of Calderone's deposition prior to trial and that the trial court conducted an inadequate Richardson inquiry into whether a discovery violation occurred and improperly allowed the State to use the deposition to impeach Calderone. See Richardson, 246 So.2d at 775.
While we agree with Pomeranz that a discovery violation occurred when the State failed to provide him with a copy of Calderone's deposition, we do not agree that reversible error resulted when the trial court conducted an inadequate inquiry into the violation and then allowed the State to use the deposition. "In determining whether a Richardson violation is harmless, [we] must consider whether there is a reasonable possibility that the discovery violation procedurally prejudiced the defense." State v. Schopp, 653 So.2d 1016, 1020 (Fla.1995). A defendant is procedurally prejudiced
if there is a reasonable probability that the defendant's trial preparation or strategy would have been materially different had the violation not occurred. Trial preparation or strategy should be considered materially different if it reasonably could have benefited the defendant. In making this determination every conceivable course of action must be considered. If the reviewing court finds that there is a reasonable possibility that the discovery violation prejudiced the defense or if the record is insufficient to determine that the defense was not materially affected, the error must be considered harmful. In other words, only if the appellate court can say beyond a reasonable doubt that the defense was not procedurally prejudiced by the discovery violation can the error be considered harmless.
Id. at 1020-21.
Pomeranz's only assertions regarding how his trial strategy would have been different *469 had he known that the State intended to use Calderone's deposition were that he might have objected to having her called as a court witness or might have redeposed her. We cannot see how these potential changes in trial tactics would have resulted in a more favorable outcome. Consent of both parties is not a prerequisite for having a witness called as a court witness. See, e.g., Brumbley v. State, 453 So.2d 381, 384 (Fla.1984) (decision to call witness as a court witness rests within discretion of the trial court "on motion of a party on ground that the witness has become uncooperative, or because the moving party does not wish to vouch for the credibility of the witness, or because the party previously calling the witness has been surprised at trial by the testimony given" (citations omitted)). Moreover, defense counsel had the same opportunity as the State to lead and cross-examine Calderone and therefore could have elicited an explanation from her regarding her inconsistent testimony. In any event, whether Pomeranz was inside the store or immediately outside the store several minutes before the murder made little difference. Because the State's failure to provide Pomeranz with Calderone's deposition did not materially hinder Pomeranz's defense, the trial court's failure to adequately inquire into whether a discovery violation occurred and the admission of this evidence was harmless beyond a reasonable doubt.
We next address Pomeranz's claim that the trial court erred in admitting evidence that he robbed Mark Meachum at gunpoint on May 1, 1992, as collateral crime evidence. After the trial in the case at bar was completed, the May 1 armed robbery conviction was reversed for a new trial,[4] and on remand, Pomeranz pled guilty to grand theft. Pomeranz asserts that when his conviction was reduced to grand theft, a lesser offense, he was thereby acquitted of the armed robbery charge and that the trial court consequently committed harmful, reversible error when it allowed introduction of the armed robbery as collateral crime evidence.[5]
Contrary to Pomeranz's assertions, it is evident that he was never acquitted of the armed robbery charge. His original conviction for armed robbery was reversed and remanded by the district court of appeal based on procedural grounds rather than on the strength of the evidence against Pomeranz. See State v. Perkins, 349 So.2d 161, 164 (Fla.1977) ("Nothing [in Perkins ] forbids admission under the `Williams Rule' of relevant evidence of collateral crimes for which acquittals have not been obtained." (emphasis added)); cf. Holland v. State, 466 So.2d 207, 209 (Fla.1985) (relevant evidence of a collateral crime is still admissible even when the charges for that crime are nol-prossed). Pleading guilty to a lesser offense on remand or having a charge nol-prossed is clearly distinguishable from obtaining an acquittal. Moreover, when Pomeranz entered his guilty plea for grand theft, he admitted to the facts that had underlay the original robbery conviction, i.e., that he robbed the victim at gunpoint. Thus, the facts underlying Pomeranz's grand theft conviction were properly admitted as collateral crime evidence.
Pomeranz next claims that the trial court committed reversible error when it allowed collateral crime evidence of four other robberies committed by Pomeranz to be presented to the jury. Pomeranz first argues that evidence of a robbery he committed in Huntsville, Alabama, on May 19, 1992, in which the same gun was used as in the robbery and murder in the case at bar, should not have been admitted because it was inflammatory and not relevant to any material fact at issue. Prior to trial, Pomeranz had filed a motion in limine contesting the admissibility of the Alabama robbery. The judge who presided at the hearing on this motion denied Pomeranz's request, finding *470 that the evidence corroborated the details of Kinser's testimony and was relevant to establish Pomeranz's identity as the killer and to rebut Pomeranz's claim that Kinser committed the murder. However, the judge imposed the following restrictions to the admissibility of the evidence: (1) the evidence could not be made a feature of the trial; (2) the State could not use the word "robbery" in referring to the crime; and (3) the State would not be permitted to elicit sympathy for the victim from the jury. Pomeranz asserts that the new judge who presided over the trial refused to enforce the prior judge's limitations on admission of the Alabama robbery evidence when the judge allowed the State to characterize the crime as a "robbery" and elicit sympathy for the crime victim.
A cornerstone of Pomeranz's defense strategy was to emphasize that he was a robber, not a murderer, and thus throughout voir dire defense counsel repeatedly stated that Pomeranz had committed other robberies and burglaries, and during Pomeranz's opening statement defense counsel discussed the dissimilarities between these other robberies and the murder. Because of these comments, the trial judge held that it would give the jury a cautionary instruction, but would not otherwise limit the State's efforts to present evidence regarding the Alabama robbery.
We find that this issue was not preserved for review because Pomeranz failed to renew his objection to the admission of the Alabama robbery during the trial below. Correll v. State, 523 So.2d 562, 566 (Fla.1988) ("Even when a prior motion in limine has been denied, the failure to object at the time collateral evidence is introduced waives the issue for appellate review."). Nor did Pomeranz object when the State referred to the Alabama robbery in its closing argument. Furthermore, we find that Pomeranz abandoned his previous objections to admission of this evidence when he chose to pursue a strategy of repeatedly informing the jury of the dozens of other robberies and burglaries he had committed. See Allen v. State, 662 So.2d 323, 328 (Fla.1995)("The defendant cannot complain about the prosecutor's comments when defense counsel emphasized the same information to the jury as part of the defense strategy."), cert. denied, ___ U.S. ___, 116 S.Ct. 1326, 134 L.Ed.2d 477 (1996).
Moreover, even if no procedural bar applied, evidence of the Alabama robbery was properly admitted on the basis that it was relevant evidence inextricably linked to the murder. See Remeta v. State 522 So.2d 825, 827 (Fla.1988) (upholding admission of a collateral murder because the same gun was used in both crimes and the evidence established defendant's possession of the murder weapon and counteracted defendant's statements blaming the crimes on a companion). Pomeranz's argument that the evidence should not have been admitted because he offered to stipulate that he was in possession of the gun in Alabama on May 21, 1992, is meritless because such a stipulation was not probative of any fact in issue and easily could have been explained away.
Pomeranz next asserts that the trial court erred in admitting into evidence three other robberies committed by Pomeranz on April 20, 1992, April 27, 1992, and April 28, 1992. We find that these claims were not preserved for review based on Pomeranz's failure to object to the admission of these robberies during the trial below. Failure to object to collateral crime evidence at the time it is introduced violates the contemporaneous objection rule and waives the issue for appellate review. Lindsey v. State, 636 So.2d 1327, 1328 (Fla.1994); Lawrence v. State, 614 So.2d 1092, 1094 (Fla.1993) (quoting Correll, 523 So.2d at 566). Moreover, Pomeranz's defense strategy of repeatedly telling the jury that he had committed dozens of other robberies and burglaries constituted a waiver of any argument he might have made regarding the admissibility of these robberies. See Allen, 662 So.2d at 328.
Pomeranz lastly asserts that the trial court erred in conducting pretrial conferences on September 22, 1992, and June 4, 1993, while he was not present. Pomeranz claims that his attendance at these conferences was essential and that his absence constituted harmful error. Florida Rule of Criminal Procedure 3.180(a) states that "the *471 defendant shall be present ... at any pretrial conference, unless waived by the defendant in writing." Pomeranz did not waive attendance of either of these conferences in writing, although defense counsel specifically waived Pomeranz's presence at the June 4, 1993, conference. Because no express written waiver was made by Pomeranz, we find that error occurred. See Coney v. State, 653 So.2d 1009, 1012 (Fla.1995), cert. denied, ___ U.S. ___, 116 S.Ct. 315, 133 L.Ed.2d 218 (1995) (conducting pre-trial conference in defendant's absence without defendant's express waiver was error although defense counsel purported to waive defendant's presence).
In situations involving violations of rule 3.180, "it is the constitutional question of whether fundamental fairness has been thwarted which determines whether the error is reversible." Garcia v. State, 492 So.2d 360, 364 (Fla.1986). A review of the record shows that Pomeranz's absence at these conferences was not prejudicial to his case. The September 22, 1992, conference, which took place shortly after Pomeranz was indicted, consisted of the trial court judge questioning defense attorney Keith Krasnove, who was representing Pomeranz in an unrelated robbery charge and happened to be before the trial court on another matter, about whether he had been retained by Pomeranz's family to defend Pomeranz in the murder case. Krasnove indicated at this hearing that he was going to be representing Pomeranz on the murder charge. The judge made it clear that he did not want to turn the discussion into a formal hearing and that his only concern was to see that Pomeranz was represented by someone. We find that the fundamental fairness of the conference was not thwarted by Pomeranz's absence and that any error that occurred was therefore harmless.
At the June 4, 1993, conference, the trial court and counsel discussed the issue of moving the trial from Martin County to a more adequate facility in St. Lucie County.[6] Due to temporary space constraints at the Martin County Courthouse, there were no adequate courtroom facilities available in Martin County to meet the space and security requirements of a capital murder trial. Pomeranz asserts that had he been present at this conference, his counsel might not have agreed to moving the case to St. Lucie County. However, we find that no prejudice occurred in this instance because while defense counsel tentatively agreed to the move, no final decision was made on this issue until June 23, 1993, at a hearing attended by Pomeranz, at which time Pomeranz gave his consent to moving the trial to St. Lucie County. We therefore find that the error caused by Pomeranz's absence from the June 4, 1993, conference was harmless.

Penalty Phase
At the outset, we agree with Pomeranz that there was insufficient evidence to support the finding that the murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting escape from custody. There was no evidence that the victim and Pomeranz were acquainted. Both of the eyewitnesses testified that the shooting began because the victim grabbed the gun. When the victim is not a police officer, this aggravator cannot be found unless the evidence clearly shows that the elimination of the witness was the sole or dominant motive for the murder. Robertson v. State, 611 So.2d 1228 (Fla.1993); Scull v. State, 533 So.2d 1137 (Fla.1988).
Likewise, we agree that the evidence does not support the finding that the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. All of the evidence of preplanning was related to the commission of a robbery rather than the perpetration of a murder. The shooting resulted from a struggle over the gun. By itself, the fact that there was an interval of up to twenty seconds before the last two shots were fired is not enough to support this aggravator.
We now address Pomeranz's contention that the trial court erred in overriding the jury's recommendation of life imprisonment *472 without possibility of parole for twenty-five years. In order to sustain a trial court's override of a jury's life recommendation, the facts supporting a sentence of death must "be so clear and convincing that virtually no reasonable person could differ." Tedder v. State, 322 So.2d 908, 910 (Fla.1975). However, if a reasonable basis exists in the record to support the jury's life recommendation, then the trial court's override is improper and must be reversed. E.g., Scott v. State, 603 So.2d 1275, 1277 (Fla.1992); Ferry v. State, 507 So.2d 1373, 1376 (Fla.1987).
The record in this case reveals a number of factors that the jury could have reasonably relied on in making its life recommendation, including Pomeranz's neurological impairment (manifesting in emotional instability, hyperactivity, an attention-deficit disorder, and an impulse control disorder); Pomeranz's age at the time of the murder (age twenty); Pomeranz's substance abuse problems; the emotional abuse Pomeranz suffered as a child; the credibility problems of Kinser (the State's main witness against Pomeranz); and the fact that Kinser received a life sentence for his involvement in the murder. In the face of only two valid aggravating circumstances, we find that there was a reasonable basis for the jury's life recommendation and that the trial court's override was improper. We therefore reverse Pomeranz's death sentence.[7]
In light of our determination that Pomeranz's death sentence should be reversed, we decline to address Pomeranz's remaining penalty-phase claims.

Conclusion
We affirm Pomeranz's robbery and first-degree murder convictions, affirm the life sentence imposed for the robbery conviction, vacate his death sentence, and remand for imposition of a consecutive life sentence without the possibility of parole for twenty-five years for the first-degree murder conviction. We further affirm the trial court's order that the consecutive life sentences be served consecutive to the five-year sentence already being served by Pomeranz for his grand theft conviction in Nineteenth Circuit Court Case Number 92-566-CFB.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, HARDING and WELLS, JJ., and GRIMES, Senior Justice, concur.
ANSTEAD, J., concurring with an opinion in which KOGAN, C.J., concurs.
ANSTEAD, Judge, concurring.
The majority opinion aptly outlines why this case is a case that should never have reached this Court. After finding no basis for much of the aggravation advanced by the trial court, the majority opinion succinctly states:
The record in this case reveals a number of factors that the jury could have reasonably relied on in making its life recommendation, including Pomeranz's neurological impairment (manifesting in emotional instability, hyperactivity, an attention-deficit disorder, and an impulse control disorder); Pomeranz's age at the time of the murder (age twenty); Pomeranz's substance abuse problems; the emotional abuse Pomeranz suffered as a child; the credibility problems of Kinser (the State's main witness against Pomeranz); and the fact that Kinser received a life sentence for his involvement in the murder. In the face of only two valid aggravating circumstances, we find that there was a reasonable basis for the jury's life recommendation and that the trial court's override was improper. We therefore reverse Pomeranz's death sentence.
Majority op. at 472. To his credit, the State Attorney in the trial court candidly acknowledged both in a written memorandum and in an oral presentation that in view of the jury's recommendation and the circumstances of this case, the maximum penalty that could lawfully be imposed was a life sentence. Despite this candid, and patently correct appraisal *473 by the State, the trial court, without even acknowledgment or discussion of the State's position or acknowledgment of the controlling law set out in Tedder v. State, 322 So.2d 908, 910 (Fla.1975), ignored the State's views and the jury's recommendation.
Of even more concern, perhaps, is the fact that this case's impact, in terms of commanding limited judicial resources, extends far beyond the resolution of just this one case. This Court must hear all appeals in capital cases where the death sentence is imposed. Art. V, § 3(b)(1), Fla. Const. The outcome in these cases, of course, will vary with the circumstances, and, fortunately, it is rare to see a case like this one, where it is patent on the face of the record that the case should not be here at all.[8] These appeals constitute a substantial portion of the Court's appellate docket and require substantial judicial resources for their review and resolution. These appeals also typically involve enormous records and numerous issues, the present case being a good example with almost 5000 pages of record and twenty-six issues covered in the extensive briefs. It should be apparent from this example that a vast amount of the time and energy of the judges of this Court must be devoted to the resolution of these cases.
In 1977, Florida Supreme Court Justice Arthur J. England, Jr., wrote an article forcefully demonstrating that the quality of justice at the Court was seriously suffering because the justices had more work to do than the time to do it. See Arthur J. England, Jr. & Michael P. McMahon, Quantity Discounts in Appellate Justice, 60 Judicature 442 (1977). Justice England was very direct in his appraisal of the system:
This article will not try to explain why backlogs occur or how they might be eliminated. Rather it will seek to show that, although the judicial system has not yet collapsed, it suffers from an insidious, precollapse erosion of its only product, justice.
Appellate judges in crowded courts are not performing their duties in the manner people believe and expect. They have stoically accepted their role as society's shock absorbers and made necessary compromises in the way they perform their duties, simply to forestall predicted disasters. In so doing, they have subtly, and perhaps unwittingly, altered the product which has been their historic contribution to American society.
Id. at 443-44.[9] The simple logic of Justice England's conclusions remains as true today as it did when explicated in 1977:
In the absence of any reasonable basis on which to conclude that jurists today are brighter or faster, or handling less complex legal issues than their forebears (and none exists to our knowledge), the conclusion is inescapable that the justices of the Florida Supreme Court are temporizing in unspoken ways simply to accomplish the work now brought to the court.

*474 It would detract from the purpose of this article to suggest what compromises I select to perform the tasks of my office, or to speculate on the time-saving mechanisms employed by my colleagues. It can be assumed that each justice's priorities for the work of the court differ, so that the shortcuts of one are not necessarily those of another.
Nonetheless, it appears beyond dispute that an unlimited consideration of each cause by each justice is more an historical fiction than a current fact. Whatever people expect from their high court justices, they should carefully assess whether the quantity of work they now assign their justices does not cause a quantity "discount" in the end product they receive.
Id. at 450. The trial court's improper override in this case, mandating this Court's automatic review, has only served to add unnecessary weight and stress to the workload of a Court already straining to properly carry out its extensive constitutional responsibilities and to give high-quality attention to its work, and especially to conscientious review of this most serious class of cases.
KOGAN, C.J., concurs.
NOTES
[1] The remaining ten issues posed by Pomeranz, which we find to be without merit, are as follows: (1) that the trial court erred in restricting cross-examination of Officer Ronald Cucchiara concerning the benefits Kinser received as a police informant; (2) that the trial court erred in excluding evidence of Kinser's bad reputation for truthfulness; (3) that the trial court erred in restricting cross-examination of Kinser concerning his prior criminal record; (4) that the trial court erred in allowing the State to use Stephan Drake's cross-examination testimony to bolster the credibility of Kinser; (5) that the trial court erred in denying Pomeranz's discovery request to obtain Kinser's prison records for the past three years; (6) that the trial court erred in failing to release or conduct an in camera review of the grand jury testimony; (7) that the trial court erred in giving a special instruction on how circumstantial evidence can be used to prove premeditation; (8) that the trial court erred in giving a jury instruction on principals when there was no evidence to support this theory; (9) that the trial court erred when it denied Pomeranz's motion for judgment of acquittal on the robbery charge; and (10) that the trial court erred in leaving Pomeranz unrepresented by counsel for a ten-day period.
[2] Richardson v. State, 246 So.2d 771 (Fla.1971).
[3] A trial court may call a witness as a court witness "if his or her expected testimony conflicts with prior statements." Jackson v. State, 498 So.2d 906, 908 (Fla.1986). A court witness may be led, cross-examined, and impeached by both parties.
[4] Pomeranz v. State, 634 So.2d 1145 (Fla. 4th DCA 1994) (reversing Pomeranz's conviction because trial court abused its discretion in limiting cross-examination of key state witnesses).
[5] Because the reversal and subsequent plea occurred after Pomeranz's conviction and sentence, it would appear that this point would more properly be raised in a postconviction motion. However, because the relevant facts are not disputed and the State makes no claim that it cannot be raised on direct appeal, we will address the point on the merits.
[6] Another issue discussed at this conference was the rescheduling of Kinser's deposition. Pomeranz does not assert error regarding this discussion.
[7] While not dispositive in this case, we note that the sentencing memorandum the State filed with the trial court prior to the allocution hearing did not discuss any aggravating and mitigating factors, conceded that there were insufficient legal factors to override the jury's life recommendation, and recommended that a life sentence be imposed on Pomeranz.
[8] Cf. Jenkins v. State, 692 So.2d 893 (Fla.1997) (judge's override of jury's recommendation of life sentence overturned where victim shot once in leg and bled to death). The judicial system, although multi-layered, is one system. Actions or inactions at one level inevitably have an effect at other levels of the same system. Even absent jurisdictional relief, trial courts can help alleviate appellate overloads by accepting responsibility and exercising restraint and good judgment in cases like this. A basic leadership principle is the acceptance of responsibility for resolving problems at the earliest available opportunity. Trial judges are the leaders of the institution where citizens and the justice system most commonly meet: the trial courts. Therefore, it is their duty to ensure that established law is followed and justice is properly dispensed regardless of the popularity of the decision or the judge's personal views. Trial judges cannot disregard the prevailing law and allow the appellate courts to sort out the resulting mess.
[9] At the time Justice England was writing about, the annual filings in the Court and cited in his article were at 2145 and the cases disposed of totaled 2078. This past fiscal year, 1996-1997, this Court had 2544 filings and 2506 dispositions, numbers twenty percent greater than the crisis overload described by Justice England. Of course, review by certiorari in 1977 could be even more burdensome, because it may have involved a review of the record in order to determine if actual conflict in decisions existed. The Supreme Court's overload described by Justice England served as the impetus for substantial changes in the Court's jurisdiction. While these changes initially provided some relief, one can see by the numbers cited above that some twenty years later the Court is again in a caseload bind that cannot help but affect the quality of justice dispensed. Unfortunately, at the time this opinion is being written, there are no proposals being debated to alleviate the present caseload crisis.