714 So.2d 411 (1998)
Ryan J. URBIN, Appellant,
v.
STATE of Florida, Appellee.
No. 89433.
Supreme Court of Florida.
May 7, 1998.
Rehearing Denied July 15, 1998.
*413 Nancy A. Daniels, Public Defender, and Nada M. Carey, Assistant Public Defender, Second Judicial Circuit, Tallahassee, for Appellant.
Robert A. Butterworth, Attorney General, and Barbara J. Yates, Assistant Attorney General, Tallahassee, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon appellant Ryan J. Urbin. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm Urbin's first-degree murder and robbery convictions but reverse his death sentence and remand for imposition of a life sentence without the possibility of parole.

FACTS
The victim in this case, Jason Hicks, was killed in the course of an armed robbery planned and carried out by three young men: Craig Flatebo, age eighteen, Jason Ambrose, age eighteen, and Urbin, age seventeen. Both Flatebo and Ambrose agreed to testify against Urbin in exchange for guilty pleas to second-degree murder and a waiver of the sentencing guidelines whereby each could receive sentences ranging from time served to two consecutive terms of life imprisonment. At the time of Urbin's trial, neither Flatebo nor Ambrose had yet been sentenced.
The trio went to Harley's Rack & Cue pool room in Jacksonville during the early morning hours of September 1, 1995. Ambrose chose Harley's because he knew people gambled there and would carry cash. Flatebo testified that the plan was to rob the first person who walked out the door. However, the first person got in his car before they could rob him, and although they followed him by car for several minutes, they broke off this effort and returned to Harley's. Upon returning to Harley's, Urbin went inside the pool room for several minutes. When he came back out, Ambrose removed from the trunk of their car a book bag containing guns, from which Urbin took a handgun. At the same time, Jason Hicks walked out of Harley's and Urbin followed with a gun in his hand and the book bag on his back. Flatebo and Ambrose then drove around the block behind Harley's, at which time they heard three shots. They next saw Urbin running towards them in the Burger King parking lot behind Harley's.
Ambrose testified that Urbin was excited and immediately said that "the victim bucked him and that he told him that he put the pistol to his head and was taking him out of the car and he put him on the ground and then he was taking the jewelry off the victim's neck and then he said he seen a lot of money in his pocket or it look like a lot of money and that when he went to go get it the victim kicked him in the leg and that's when he shot him and that's when he ran." Ambrose testified that Urbin was chosen by the trio to actually perpetrate the robbery "[b]ecause he had the nerve to do it." Ambrose stated that he took one gun out of the backpack and handed it to Urbin, not Flatebo, although Flatebo owned several guns in the backpack. He further related that Urbin had Hicks' wallet, and when Ambrose saw Hicks' driver's license, he realized that he knew him.
Flatebo testified that Ambrose stopped the car and picked up Urbin, who was "awful excited." Urbin kept repeating that the victim "shouldn't have bucked"; that is, he should not have resisted. Urbin told them he had followed the victim to his car and told him to remove his jewelry. After he complied, Urbin forced him to the ground and reached into his pocket, at which time the victim tried to kick Urbin's legs out from under him. Urbin said he shot the victim at that point because he bucked and because he had seen his face. Urbin showed his accomplices a gold necklace with a bulldog charm and a diamond ring that he took from Hicks. Flatebo admitted that he pawned some jewelry that Urbin gave him but denied that the jewelry was from Hicks. He also admitted calling Michelle Bennett and asking her to get rid of the murder weapon.
Steven Mann, a friend of Urbin's, testified that he heard the trio discuss a robbery at a party the night of the killing. Several days later, Mann, Urbin, Larry Motley, and Steve DeVore drove to Fort Myers to see DeVore's *414 father. While there, Mann said that Urbin told him that he had killed Hicks because he resisted the robbery.
Raymond Graham testified that at approximately 2:45 a.m. on the night of the killing he heard three gunshots coming from the parking lot while he was inside Harley's. Immediately thereafter, he saw a white male running across the parking lot, and he identified that individual as Urbin.
The medical examiner testified that Hicks died from gunshot wounds. He also testified that the injuries to Hicks' face"a laceration or tearing of the skin in the bridge of the nose, the right lower lip and also the left eyebrow, and over here we see an abrasion and bruise right there"were consistent with having been struck about the face with a pistol.
Urbin testified and denied being the gunman. He testified that he was very intoxicated when they left the party and went to Harley's. They parked the car in the Burger King parking lot upon returning to Harley's the second time after the first intended victim left, at which time Ambrose and Flatebo exited the car and walked back to Harley's. Urbin alleged that Ambrose had issued himself a .38 pistol out of the backpack and gave Flatebo a black .357 magnum. Urbin claimed he did not receive a gun. Urbin alleged that he then heard three gunshots approximately four to five minutes later, and then Ambrose and Flatebo ran back to the car. He testified that Flatebo said he robbed the victim, and then shot him when he bucked. He also testified that Flatebo had the victim's wallet and jewelry. Urbin expressly denied shooting the victim and denied confessing to Mann. Urbin also denied that he was implicating Flatebo as revenge for Flatebo's testimony against Urbin in a subsequent home invasion case.[1] He further denied approaching several jail inmates and asking them to testify that Flatebo had confessed to them that he had committed the murder. Subsequently, the State presented the testimony of three jail inmates that Urbin had asked them to lie by testifying that Flatebo confessed to the killing.

PENALTY PHASE
Urbin was found guilty by the jury of first-degree murder. During the penalty phase, the state attorney who had prosecuted Urbin for the later home invasion testified that Urbin was convicted of armed robbery, armed burglary, and armed kidnaping in that case.
In the defense case, Helene Urbin testified at length on her son's behalf and described his life to date. She left Urbin's father when Urbin was six months old because of his physical, verbal, and substance abuse. She spent two years in prison for trafficking in cocaine, during which time Urbin was left alone much of the time, although ostensibly cared for by his older brother and a friend. Ms. Urbin also blamed Steve Mann for many of Urbin's problems, including his drug abuse and criminal activities. Urbin testified that his home life was "okay" until his mother was imprisoned. He admitted to his drug and alcohol abuse and testified that he was drinking and snorting cocaine the night of the murder.
Dr. Ernest Miller, a psychiatrist, testified that he had examined Urbin and analyzed a lengthy and detailed account by Urbin's mother describing Urbin's upbringing and problems. Noting that Urbin lacked a father figure or male role model, he observed that Urbin's role models were dissocial, criminal peers. Dr. Miller testified that Urbin suffered from anxiety, depression, and substance abuse disorder and was addicted to both drugs, in particular powder cocaine and LSD, and alcohol. He also explained that drug addiction results in impulsivity, that is, the drug abuser does only what he must do to perpetuate and maintain access to the drug supply. Dr. Miller opined that impulsivity became the driving and dominant feature of Urbin's behavior. He also testified that Urbin knew right from wrong, was not insane at the time of the offense, and was not *415 incapable of premeditation. However, based on Urbin's self-reporting and his mother's letter detailing his substance abuse history, Dr. Miller ventured that the use of drugs and alcohol on the night of the homicide would have impaired Urbin's thought processes in instantly reacting to Hicks' physical resistance to the robbery.
The jury recommended a death sentence and the trial court sentenced Urbin to death for the murder and to 26.64 years in prison for the robbery.[2]

APPEAL
Urbin does not challenge on appeal the sufficiency of the evidence to support his conviction for first-degree murder. Nevertheless, our review of the record confirms that there was sufficient evidence to support the first-degree murder conviction as well as the conviction for robbery.
Urbin raises three claims of error on appeal as to the death sentence. The claims are: (1) the trial court erred in finding the avoid arrest aggravator; (2) Urbin's death sentence is disproportional; and (3) the prosecutor's penalty phase closing argument rendered the entire sentencing proceeding fundamentally unfair.

Murder Committed for Purpose of Avoiding or Preventing a Lawful Arrest
In Riley v. State, 366 So.2d 19 (Fla.1978), we first extended application of the aggravator of a murder committed for the purpose of avoiding or preventing a lawful arrest beyond those involving law enforcement personnel, to include other capital murders specifically involving witness elimination. In so doing, we cautioned that "[p]roof of the requisite intent to avoid arrest and detection must be very strong," in such cases, id. at 22, to sustain the avoid arrest aggravator as it pertains to witness elimination. Shortly thereafter, we reaffirmed Riley and explained our holding there as to the requirements of this aggravator:
[A]n intent to avoid arrest is not present, at least when the victim is not a law enforcement officer, unless it is clearly shown that the dominant or only motive for the murder was the elimination of witnesses.
Menendez v. State, 368 So.2d 1278, 1282 (Fla. 1979) (emphasis supplied).
We have reaffirmed that standard in numerous cases during the last twenty years. See, e.g., Consalvo v. State, 697 So.2d 805 (Fla.1996) ("In other words, the evidence must prove that the sole or dominant motive for the killing was to eliminate a witness."); Robertson v. State, 611 So.2d 1228, 1232 (Fla. 1993) ("[T]he State must show beyond a reasonable doubt that the defendant's dominant or only motive for the murder of the victim, who is not a law enforcement officer, is the elimination of a witness."); Floyd v. State, 497 So.2d 1211, 1215 (Fla.1986) ("The state must clearly show that the dominant or only motive for the murder was the elimination of a witness."); Bates v. State, 465 So.2d 490, 492 (Fla.1985) (reasoning that "`it must be clearly shown that the dominant or only motive for the murder was the elimination of' the witness"). Even more recently, we reaffirmed that this aggravator "cannot be found unless the evidence clearly shows that the elimination of the witness was the sole or dominant motive for the murder." Pomeranz v. State, 703 So.2d 465, 471 (Fla.1997). In Pomeranz, we struck the avoid arrest *416 aggravator because there was no evidence that the defendant and the victim were acquainted and where both eyewitnesses testified "that the shooting began because the victim grabbed the gun." Id. From these examples, we can distill an overarching rule from our earliest cases onward discussing this aggravator: the proof must demonstrate beyond a reasonable doubt that the victim was murdered solely or predominantly for the purpose of witness elimination.
In applying this legal standard to the facts of this case, we conclude that the avoid arrest aggravator cannot stand. Flatebo, Ambrose, and Mann all testified that Urbin shot the victim because the victim resisted the robbery attempt, a critical consistency in all of the witnesses' testimony relating Urbin's statements about the shooting.[3] Of course, Urbin's statements to those witnesses were relied upon by the State to establish the circumstances of the shooting. A shooting during a scuffle was also indicated by the facial injuries[4] inflicted upon Hicks and described by the medical examiner. Further, as Urbin argues, "Although Flatebo testified that Urbin said he shot the victim because he bucked and because he saw his facethe evidence suggests this latter fact was at most a corollary, or secondary motive, not the dominant one." Based upon the evidence presented at trial, we conclude this factual situation more closely resembles the fatal confrontation in Cook v. State, 542 So.2d 964, 970 (Fla.1989), wherein we found that the facts indicated that the defendant "shot instinctively, not with a calculated plan to eliminate [the victim] as a witness." See also Livingston v. State, 565 So.2d 1288, 1292 (Fla.1988) (striking avoid arrest aggravator because defendant's statement after shooting first victim, "now I'm going to get the one in the back [of the store]," did not establish beyond a reasonable doubt that witness elimination was sole or dominant motive in shooting).
Consequently, we find that the State did not carry its burden in demonstrating by proof beyond a reasonable doubt that witness elimination was Urbin's dominant or sole motive[5] in the killing.

Proportionality
In performing a proportionality review, a reviewing court must never lose sight of the fact that the death penalty has long been reserved for only the most aggravated and least mitigated of first-degree murders. State v. Dixon, 283 So.2d 1, 7 (Fla.1973). See also Jones v. State, 705 So.2d 1364, 1366 (Fla.1998) (reasoning that "[t]he people of Florida have designated the death penalty as an appropriate sanction for certain crimes, and in order to ensure its continued viability under our state and federal constitutions `the Legislature has chosen to reserve its application to only the most aggravated and unmitigated of [the] most serious crimes.'") (footnote omitted).
Proportionality review "requires a discrete analysis of the facts," Terry v. State, 668 So.2d 954, 965 (Fla.1996), entailing a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis. We underscored this imperative in Tillman v. State, 591 So.2d 167 (Fla.1991):
We have described the "proportionality review" conducted by this Court as follows:
Because death is a unique punishment, it is necessary in each case to engage in a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances.

Porter v. State, 564 So.2d 1060, 1064 (Fla. 1990). The requirement that death be administered proportionately has a variety of sources in Florida law, including the Florida Constitution's express prohibition against unusual punishments. Art. I, § 17, *417 Fla. Const. It clearly is "unusual" to impose death based on facts similar to those in cases in which death previously was deemed improper. Id. Moreover, proportionality review in death cases rests at least in part on the recognition that death is a uniquely irrevocable penalty, requiring a more intensive level of judicial scrutiny or process than would lesser penalties. Art. I, § 9, Fla. Const.; Porter.

... Thus, proportionality review is a unique and highly serious function of this Court, the purpose of which is to foster uniformity in death-penalty law.
Id. at 169 (alterations in original) (citations and footnote omitted). As we recently reaffirmed, proportionality review involves consideration of "the totality of the circumstances in a case" in comparison with other death penalty cases. Sliney v. State, 699 So.2d 662, 672 (Fla.1997) (citing Terry, 668 So.2d at 965).
We conclude that our decisions in prior similar cases, exemplified by our opinion in Livingston v. State, 565 So.2d 1288 (Fla. 1988), militates against imposition of the death penalty in this case. See also Terry; Curtis v. State, 685 So.2d 1234, 1237 (Fla. 1996) (finding death sentence disproportionate where defendant's age of seventeen years, remorse, helpfulness to schoolmates and fellow inmates, and fact that codefendant fired fatal shot and was sentenced to life, outweighed two statutory aggravators merged felony murder/pecuniary gain and prior violent felony conviction), cert. denied, ___ U.S. ____, 117 S.Ct. 2521, 138 L.Ed.2d 1022 (1997); Morgan v. State, 639 So.2d 6, 14 (Fla.1994) (finding death sentence disproportionate where substantial mitigation, including defendant's age of sixteen years, extreme mental or emotional disturbance, impaired capacity, marginal intelligence, extreme immaturity, learning disorder, illiteracy, brain damage, and gasoline sniffing on day of murder, outweighed HAC and committed during course of an enumerated felony aggravators).
In Livingston, the defendant was convicted of burglary and grand theft for one incident earlier on the same day as the murder and of first-degree murder, attempted first-degree murder, armed robbery, and displaying a weapon during a robbery. Livingston shot and killed a convenience store attendant during an armed robbery and fired at another woman inside the store. 565 So.2d at 1289. The trial court found three aggravators: prior violent felony conviction, murder committed during armed robbery, and murder committed to avoid arrest. In mitigation, the trial court found Livingston's age of seventeen years in statutory mitigation, as well as the nonstatutory mitigation of his unfortunate home life and rearing. Id. at 1292.[6] Under these circumstances, and after striking the avoid arrest aggravator,[7] we found that the death sentence was disproportionate. Id.
In comparing Livingston to this case, we find the fact that both Urbin and Livingston were seventeen years old at the time of the murders to be particularly compelling. Likewise, we find that Urbin has comparable if not stronger mitigation than that involved in Livingston, especially considering the trial court's finding of a second statutory mitigator: Urbin's capacity to appreciate the criminality of his conduct was substantially impaired at the time of the shooting. Those critical parallels, combined with the extensive evidence of parental abuse and neglect, plus the fact that Urbin's mother was in prison for drug crimes during his formative years from age eleven to thirteen, constitute particularly strong mitigation that differentiates this case from those few instances where we have affirmed death sentences for seventeen-year-old defendants. See Bonifay v. State, 680 So.2d 413 (Fla.1996); LeCroy v. State, 533 So.2d 750 (Fla.1988).
*418 We note that the parental neglect in this case is even greater than that found in Livingston. As Urbin accurately summarizes in his brief:
Helene [Urbin's mother] was frequently absent, leaving Ryan alone to roam the streets with little or no guidance. Although Ryan struggled in school from an early age, his learning disability (dyslexia) was not identified until he was a teenager. Helene worked at a number of odd jobs and eventually turned to drug dealing and prostitution. When Ryan was eleven, his mother was sent to prison for two years for trafficking in cocaine. Ryan was left in the care of his stepbrother, who within a few months got married and left the home, and Helene's boyfriend, who drank, did drugs, and may have sexually molested Ryan. Although Helene's mother cared for Ryan for some undetermined period of time, she apparently exerted little influence over him. Ryan therefore was essentially without adult supervision during the critical years of his early adolescence. Not surprisingly, Ryan himself turned to drugs and alcohol and became addicted.
Appellant's Initial Brief at 53-54. We also agree that in combination with the other statutory and non-statutory mitigating circumstances, Urbin's age is an extremely weighty mitigator. Cf. Livingston, 565 So.2d at 1292 ("Livingston's youth, inexperience, and immaturity also significantly mitigate his offense.").
In Allen v. State, 636 So.2d 494, 497 (Fla.1994), we held that the death penalty was either "cruel or unusual if imposed upon one who was under the age of sixteen when committing the crime; and death thus is prohibited by article I, section 17 of the Florida Constitution." Here the defendant is seventeen, below the age of majority, although above the constitutional line for the death penalty. However, considering that it is the patent lack of maturity and responsible judgment that underlies the mitigation of young age, Livingston, the closer the defendant is to the age where the death penalty is constitutionally barred, the weightier this statutory mitigator becomes. This is especially true when there is extensive evidence of parental neglect and abuse that played a significant role in the child's lack of maturity and responsible judgment.
We further note that there is no dispute that the prior violent felony used as an aggravator for this killing actually occurred approximately two weeks after Jason Hicks' murder, as compared to the prior felonies involved in Livingston. Nor is there any doubt that the merged aggravating factors of murder committed in the course of a felony and murder for pecuniary gain were based on the same incident resulting in Hicks' death.
For all of the reasons detailed above, we conclude that this tragic killing, while sufficient to result in the seventeen-year-old defendant's imprisonment for the rest of his life without the possibility of parole, does not belong in the category of the most aggravated and least mitigated of first-degree murders that merit imposition of the death penalty. Accordingly, we find that death is a disproportionate penalty in this case.

Prosecutor's Penalty-Phase

Argument[8]
Although mooted by our reversal on the basis of proportionality, and not objected *419 to below, we would be remiss in our supervisory responsibility if we did not acknowledge and disapprove of a number of improprieties in the prosecutor's closing penalty-phase argument. Recently, in setting aside a death sentence in another armed robbery involving a teenage victim and a teenage defendant, we observed: "Although this legal preceptand indeed the rule of objective, dispassionate law in generalmay sometimes be hard to abide, the alternativea court ruled by emotionis far worse." Jones v. State, 705 So.2d 1364, 1367 (Fla.1998). Similarly, in King v. State, 623 So.2d 486 (Fla.1993), we cautioned against prosecutors injecting "elements of emotion and fear into the jury's deliberations":
During closing argument at the penalty phase, the prosecutor gave a dissertation on evil that King now argues amounted to admonishing the jurors that "they would be cooperating with evil and would themselves be involved in evil just like" King if they recommended life imprisonment. Closing argument "must not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant." Bertolotti v. State, 476 So.2d 130, 134 (Fla.1985). Furthermore, if "comments in closing argument are intended to and do inject elements of emotion and fear into the jury's deliberations, a prosecutor has ventured far outside the scope of proper argument." Garron v. State, 528 So.2d 353, 359 (Fla.1988). We agree with King that the instant prosecutor went too far with this argument and that King must be given a new sentencing proceeding before a jury.
Id. at 488-89. Similarly, in Garron v. State, 528 So.2d 353 (Fla.1988), we discussed a litany of improper comments during argument:
At closing argument of the penalty phase, the prosecutor made several remarks which, notwithstanding curative instructions, were so egregious, inflammatory, and unfairly prejudicial that a mistrial was the only proper remedy. The following remarks, when taken in their totality, justify a new penalty proceeding. The prosecutor stated:
[T]he people of the State of Florida, ladies and gentlemen, have determined that in order to deter others from walking down the streets and gunning down.... [Note 5]
[Note 5]. Objections to this comment were sustained and the jury was instructed to disregard it.
....
[Y]ou can just imagine the pain this young girl was going through as she was laying there on the ground dying.... Imagine the anguish and the pain that Le Thi Garron felt as she was shot in the chest and drug [sic] herself from the bathroom into the bedroom where she expired. [Note 6]
[Note 6]. Under this Court's decision in Bertolotti v. State, 476 So.2d 130 (Fla. 1985), such violations of the "Golden Rule" against placing the jury in the position of the victim, and having them imagine their pain are clearly prohibited. 476 So.2d at 133.
....
The law is such that when the aggravating factors outnumber the mitigating factors, then death is an appropriate penalty. [Note 7]
[Note 7]. An objection was sustained on the basis that the comment is a misstatement of the law.
....
If Le Thi were here, she would probably argue the defendant should be punished for what he did. [Note 8]
[Note 8]. Objections to these comments were sustained and curative instructions were given to the jury.
....
Ladies and gentlemen, I believe at this point, I would hope at this point, that the jurors will listen to the screams and to her desires for punishment for the defendant and ask that you bring back a recommendation that will tell the *420 people of Florida, that will deter people from permitting.... [Note 9]
[Note 9]. An objection was sustained and the court instructed the jury to disregard the remark.
....
[I]t is your sworn duty as you came in and became jurors to come back with a determination that the defendant should die for his actions. [Note 10]
[Note 10]. Again, defense counsel's objections to this misstatement of the law were sustained, and the jury was instructed to disregard the comment.
....
... When comments in closing argument are intended to and do inject elements of emotion and fear into the jury's deliberations, a prosecutor has ventured far outside the scope of proper argument. These statements when taken as a whole and fully considered demonstrate the classic case of an attorney who has overstepped the bounds of zealous advocacy and entered into the forbidden zone of prosecutorial misconduct. In his determination to assure that appellant was sentenced to death, this prosecutor acted in such a way as to render the whole proceeding meaningless. While it is true that instructions to disregard the comments were given, it cannot be said that they had any impact in curbing the unfairly prejudicial effect of the prosecutorial misconduct.
Id. at 358-59. With this background, we point out several of the instances of misconduct displayed during the prosecutor's closing penalty-phase argument in the present case.[9]
First and foremost, we are particularly concerned that the prosecutor invited the jury to disregard the law. Urbin argues that the prosecutor improperly asserted that if Urbin was sentenced to life in prison, he could still be released some day[10] because "We all know in the past laws have changed. And we all know that in the future laws can change." We find this to be particularly egregious because it invites a jury to disregard the law as it is written by the legislature. The obvious intent of the legislature in establishing this sentencing scheme was to prohibit parole for the covered offenses, period. By his specious comment that "we all know that in the future laws can change," the prosecutor invited the jury to disregard this law. In effect, the prosecutor encouraged the jury to reject the only lawful alternative to the death penalty, even if they believed that to be the right recommendation, based on a reflexive fear that, regardless of the law, Urbin might someday be eligible for parole.[11] We find this exhortation of particular concern because it is advanced by the State, obviously the same State that has mandated the "no parole" life sentence alternative. This type of "ignore the law" argument has absolutely no place in a trial, especially when asserted by the State.
*421 To aggravate matters further, the prosecutor asserted that any juror's vote for a life sentence would be irresponsible and a violation of the juror's lawful duty. The prosecutor argued that "my concern is that some of you may be tempted to take the easy way out, to not weigh the aggravating circumstances and the mitigating circumstances and not want to fully carry out your responsibility and just vote for life." The prosecutor continued, "I'm going to ask you not be swayed by pity or sympathy. I'm going to ask you what pity, what sympathy, what mercy did the defendant show Jason Hicks. I'm going to ask you to follow the law. I'm going to ask you to do your duty." The prosecutor's comments are similar to those condemned in Redish v. State, 525 So.2d 928 (Fla. 1st DCA 1988), wherein the First District found the prosecutor's remark that the jury would be "`in violation of your oath as jurors' if they `succumb[ed] to the defense argument', was ... an impermissible attempt by the prosecution to instruct the jury as to its duties and functions." Id. at 930. The argument also violated our holding in Garron, 528 So.2d at 359 & n. 10 (finding prosecutor misstated law when he exhorted the jury that it "is your sworn duty as you came in and became jurors to come back with a determination that the defendant should die for his actions").[12]
We also note that the prosecutor, as in Garron, went far beyond the evidence in emotionally creating an imaginary script demonstrating that the victim was shot while "pleading for his life." We find that, as in Garron, the prosecutor's comments constitute a subtle "golden rule" argument, a type of emotional appeal we have long held impermissible. By literally putting his own imaginary words in the victim's mouth, i.e., "Don't hurt me. Take my money, take my jewelry. Don't hurt me," the prosecutor was apparently trying to "unduly create, arouse and inflame the sympathy, prejudice and passions of [the] jury to the detriment of the accused." Barnes v. State, 58 So.2d 157, 159 (Fla.1951); see Garron, 528 So.2d at 359 nn. 6, 8 & 9; Bertolotti, 476 So.2d at 133.
The prosecutor's attack on Urbin's mother as the "mistress of excuses"[13] and, more importantly, his criticism of her because "she never once tried to express concern, that remorse, that sorrow to the family of Jason Hicks," was likewise improper. Shellito v. State, 701 So.2d 837 (Fla.1997); Colina v. State, 570 So.2d 929 (Fla.1990). These attacks could only serve to prejudice Urbin for any animosity that may have been aroused in the jury for Urbin's mother, hence essentially turning the substantial mitigation of parental neglect against Urbin.
Finally, we note that the prosecutor improperly concluded his argument by stating, "If you are tempted to show this defendant mercy, if you are tempted to show him pity, I'm going to ask you to do this, to show him the same amount of mercy, the same amount of pity that he showed Jason Hicks on September 1, 1995, and that was none." This line of argument is blatantly impermissible under Rhodes v. State, 547 So.2d 1201, 1206 (Fla.1989) (finding same mercy argument improper because it was "an unnecessary appeal to the sympathies of the jurors calculated to influence their sentence recommendation"), and Richardson v. State, 604 So.2d 1107, 1109 (Fla.1992) (finding error where prosecutor asked jury to show defendant "as much pity as he showed his victim"). The prosecutor also stated that, "Now this defendant wants a life sentence for robbing somebody and murdering them. What kind of message would that sendwhat kind of message would a life recommendation send to this defendant?" (Emphasis added.) Although the prosecutor tried to limit the clearly improper "message" argument to Urbin, this is precisely the type of emotional argument we condemned in Bertolotti, 476 So.2d *422 at 133, and Campbell v. State, 679 So.2d 720, 724-25 (Fla.1996). As we stated, "[t]hese considerations are outside the scope of the jury's deliberation and their injection violates the prosecutor's duty to seek justice, not merely `win' a death recommendation." Bertolotti, 476 So.2d at 133; Campbell, 679 So.2d at 724.[14]
The fact that so many of these instances of misconduct are literally verbatim examples of conduct we have unambiguously prohibited in Bertolotti, Garron, and their progeny simply demonstrates that there are some who would ignore our warnings concerning the need for exemplary professional and ethical conduct in the courtroom.

CONCLUSION
In summary, while we affirm Urbin's first-degree murder and robbery convictions, we reverse his death sentence and remand for imposition of a life sentence without the possibility of parole.
It is so ordered.
KOGAN, C.J., and SHAW, HARDING, ANSTEAD and PARIENTE, JJ., concur.
WELLS, J., concurs with an opinion.
OVERTON, J., concurs as to conviction, and concurs in result only as to sentence.
WELLS, Justice, concurring.
I concur in affirming appellant's convictions.
I concur in result only as to appellant's sentence.
I agree that appellant's death sentence is disproportional based on Livingston v. State, 565 So. 2d 1288 (Fla. 1998), and that there was an unique combination of mitigation circumstances including the imprisonment of appellant's mother for drug offenses during a significant portion of appellant's life.
I disagree, however, with the majority's conclusion regarding the trial court's factual finding that this murder was committed for the purpose of avoiding or preventing a lawful arrest. In its sentencing order, the trial court found: "After the Defendant attempted to remove the wallet or money from the victim's pocket, the victim turned around and saw the Defendant's face, and that was the reason he shot the victim. The Court finds that this aggravation circumstance was proven beyond a reasonable doubt." The record reflects competent, substantial evidence to sustain this finding. I believe that on factual findings relating to whether an aggravation has been proven beyond a reasonable doubt, we should defer to the trial judge, who was in the courtroom and had an opportunity to judge the credibility of the witnesses. As we recently stated in Willacy v. State, 696 So. 2d 693 (Fla.), cert. denied, ___ U.S. ____, 118 S.Ct. 419, 139 L.Ed.2d 321 (1997):
[I]t is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubtthat is the trial court's job. Rather, our task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.
Id. at 695 (emphasis added) (footnote omitted). This is not a principle which should be used selectively depending on whether we agree with the trial judge's factual findings.
NOTES
[1] On September 13, 1995, less than two weeks after the Hicks murder, Urbin, Flatebo, and Jody Damren invaded the home of Bonnie Hilton, assaulted her, and stole jewelry, food, and guns from the house. Urbin and Damren were convicted of armed robbery with a firearm, burglary with assault, and armed kidnapping on April 24, 1996.
[2] The trial court found the following statutory aggravators: (1) the defendant was previously convicted of a felony involving the use or threat of violence to the person, § 921.141(5)(b), Fla. Stat. (1995); (2) the murder was committed during the commission or attempted commission of a robbery, § 921.141(5)(d); (3) the murder was committed for pecuniary gain, § 921.141(5)(f); and (4) the murder was committed for the purpose of avoiding or preventing a lawful arrest, § 921.141(5)(e). Aggravators (2) and (3) were merged and treated as one aggravator by the trial court. The trial court found the following statutory mitigators: (1) the age of the defendant at the time of the crime, § 921.141(6)(g), accorded some weight; and (2) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, § 921.141(6)(f), accorded some weight. As to nonstatutory mitigation, the trial court found and accorded the absence of Urbin's father very little weight; found and gave his drug and alcohol abuse some weight; found the mother's imprisonment as a mitigator and gave it some weight; gave the defendant's dyslexia some weight; and gave his employment history some weight.
[3] It is also interesting to note that Urbin himself, in testifying that his accomplices killed the victim, stated that they did so only when the victim "bucked" or resisted the robbery.
[4] These were probably the result of a pistol blow to the upper face, in the medical examiner's opinion.
[5] There is no dispute that witness elimination was not the sole motive in the killing.
[6] We noted that in mitigation, "Livingston's childhood was marked by severe beatings by his mother's boyfriend who took great pleasure in abusing him while his mother neglected him," and that his "youth, inexperience, and immaturity also significantly mitigate his offense." Id.
[7] See id. (striking the avoid arrest aggravator because State did not prove beyond a reasonable doubt that witness's testimony that defendant said, after shooting first victim, "now I'm going to get the one in the back [of the store]" established witness elimination as dominant or only motive in shooting).
[8] The State correctly points out that because there was no contemporaneous objection to the prosecutor's argument, this issue should be procedurally barred. We have long held that allegedly improperly prosecutorial comments are not cognizable on appeal absent a contemporaneous objection. See Kilgore v. State, 688 So.2d 895, 898 (Fla.1996), cert. denied, ___ U.S. ____, 118 S.Ct. 103, 139 L.Ed.2d 58 (1997); Gibson v. State, 351 So.2d 948, 950 (Fla.1977); State v. Jones, 204 So.2d 515 (Fla.1967). The only exception to this blanket procedural bar is where the comments constitute fundamental error, defined as error that "reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Kilgore, 688 So.2d at 898. Urbin's appellate counsel suggested at oral argument that the lack of objection to the numerous instances of clear misconduct revealed the quality of defense representation at trial. We tend to agree on this record, especially as to defense counsel's extremely brief and unfocused penalty-phase closing argument. Indeed, defense counsel opened his argument by assuring the jury that, "I'll try and keep what [the prosecutor] may not have covered in my argument within ten minutes." In that goal, defense counsel succeeded, proudly closing his abbreviated remarks by stating, "I did it in ten minutes."
[9] The prosecutor's argument comprised approximately thirty-three transcribed pages and was full of "emotional fear" and efforts to dehumanize and demonize the defendant. The prosecutor used the word "executed" or "executing" at least nine times; described Urbin as a "cold-blooded killer," a "ruthless killer"; stated several times that Urbin's offenses exhibited "deepseeded [sic] violence. It's vicious violence. It's brutal violence"; stated that he was "violent to the core, violent in every atom of his body"; claimed that his offenses were "the coldest violence most people have ever encountered"; and stated that Urbin showed his "true, violent, and brutal and vicious character" in committing the murder. Plainly, these are not isolated comments of the type we have deemed harmless in other cases, but rather are akin to the dehumanizing comments we found improper in Bonifay v. State, 680 So.2d 413, 418 n. 10 (Fla.1996).
[10] The prosecutor's exact words were:

I anticipate that the defense lawyer is going to argue for youargue to you to recommend the life sentence. They're going to argue that life without parole is what you ought to recommend. And I submit to you today now that is the state of the law, life without parole. We all know in the past laws have changed. And we all know that in the future laws can change. The law now is life without parole.
[11] See Walker v. State, 707 So.2d 300, 314 (Fla. 1997) ("This Court has explained that `the probability of recurring violent acts by the defendant if he is released on parole in the distant future' is not a proper aggravating circumstance in Florida.").
[12] The prosecutor also misstated the law as we have defined it regarding the jury's obligation to recommend death. See Henyard v. State, 689 So.2d 239, 249-50 (Fla.1996) (stating that "a jury is neither compelled nor required to recommend death where aggravating factors outweigh mitigating factors"); see also Garron, 528 So.2d at 359 & n. 7 (misstatement of the law to argue "that when the aggravating factors outnumber the mitigating factors, then death is an appropriate penalty").
[13] The prosecutor used this derogatory term three times.
[14] The transcript reflects that the prosecutor improperly denigrated the evidence of mitigation throughout his argument and repeatedly labeled the mitigation as "excuses," employing the pejorative term no less than eleven times. We conclude that this argument was improper, especially in view of the fact that the State presented no evidence to rebut the mitigation and the trial judge found and gave weight to all of the proffered mitigators. Cf. Nibert v. State, 574 So.2d 1059, 1062 (Fla.1990) (holding that "when a reasonable quantum of competent, uncontroverted evidence of a mitigating circumstance is presented, the trial court must find that the mitigating circumstance has been proved"); see also Davis v. State, 698 So.2d 1182, 1191 (Fla.1997) (reaffirming that "a trial court must find that a particular mitigating circumstance has been proved whenever the defendant has presented a `reasonable quantum of competent, uncontroverted evidence' of that mitigating circumstance").