580 So.2d 610 (1991)
Mark J. ASAY, Appellant,
v.
STATE of Florida, Appellee.
No. 73432.
Supreme Court of Florida.
May 16, 1991.
Rehearing Denied June 21, 1991.
Nancy Daniels, Public Defender and W.C. McLain, Asst. Public Defender, Second Judicial Circuit, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen., Richard B. Martell, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Mark J. Asay, a prisoner under two sentences of death, appeals his convictions of first-degree murder and the attendant sentences of death. We have jurisdiction, article V, section 3(b)(1), Florida Constitution, and affirm both the convictions and sentences.
According to testimony of Asay's brother, Robbie, and Robbie's friend, "Bubba" McQuinn, on July 17, 1987, the three met at *611 a local bar where they drank beer and shot pool. They left the bar around 12:00 a.m. and went to a second bar where they stayed until closing at 2:00 a.m. Although Asay drank a number of beers, both Bubba and Robbie testified that Asay did not appear drunk or otherwise impaired.
After the bar closed, Robbie said he wanted to try to "pick up a girl" he had seen at the bar, so Bubba and Asay drove around the corner in Asay's truck. They returned to discover that Robbie had been unsuccessful with the girl he had seen, so Bubba suggested that they go downtown to find some prostitutes and he would pay for oral sex for them all. Asay and Bubba left in Asay's truck and Robbie left in his. Once downtown, Asay and Bubba soon spotted Robbie who was inside his truck talking to a black man, Robert Lee Booker. Robbie was telling Booker who was standing at the driver's side window of Robbie's truck that he and his friends were looking for prostitutes.
After spotting Booker standing by Robbie's truck, Asay told Bubba to pull up next to the truck. Asay immediately got out of his truck, proceeded to Robbie's truck, and told Robbie "You know you ain't got to take no s____t from these f____ing niggers." Although Robbie told Asay that "everything is cool," Asay began to point his finger in Booker's face and verbally attack him. When Booker told him "Don't put your finger in my face," Asay responded by saying "F____k you, nigger" and pulling his gun from his back pocket, shooting Booker once in the abdomen. Booker grabbed his side and ran. According to the medical examiner, the bullet perforated the intestines and an artery causing internal hemorrhaging. Booker's body was later found under the edge of a nearby house.
Robbie drove away immediately after the shooting. Asay jumped into the back of his truck, as Bubba drove off. When Asay got into the cab of the truck, Bubba asked him why he shot Booker. Asay responded, "Because you got to show a nigger who is boss." When asked if he thought he killed Booker, Asay replied, "No, I just scared the s____t out of him."
Bubba testified that after the shooting, Asay and Bubba continued to look for prostitutes. According to Bubba, he saw "Renee" who he knew would give them oral sex. It appears that at the time neither Bubba nor Asay was aware that "Renee" was actually Robert McDowell, a black man dressed as a woman. According to Bubba, he negotiated a deal for oral sex for them both. Bubba drove the truck into a nearby alley. McDowell followed. Bubba testified that McDowell refused to get into the truck with them both, so Asay left the truck and walked away to act as a lookout while Bubba and McDowell had sex. As McDowell started to get into the truck with Bubba, Asay returned, grabbed McDowell's arm, pulled him from the truck and began shooting him. McDowell was shot six times while he was backing up and attempting to get away. Asay jumped back in his truck and told Bubba to drive away. When asked why he shot McDowell, Asay told Bubba that he did it because "the bitch had beat him out of ten dollars" on a "blow job." McDowell's body was found on the ground in the alley soon after the shots were heard. According to the medical examiner, any of three wounds to the chest cavity would have been fatal.
Asay later told Charlie Moore in the presence of Moore's cousin, Danny, that he shot McDowell because McDowell had cheated him out of ten dollars on a drug deal and that he had told McDowell, "if he ever got him that he would get even." Asay told Moore that he was out looking for "whores," when he came across McDowell. According to Moore's cousin, Danny, Asay also told Moore that his plan was to have Bubba get McDowell in the truck and they "would take her off and screw her and kill her." Moore testified that Asay told him that when Bubba "didn't have [McDowell] in the truck so they could go beat him up," Asay "grabbed [McDowell] by the arm and stuck the gun in his chest and shot him four times, and that when he hit the ground, he finished him off." As a result of tips received from Moore and his cousin after McDowell's murder was featured on a television Crime Watch segment, Asay *612 was arrested and charged by indictment with two counts of first-degree murder.
The state also presented testimony of Thomas Gross, who was Asay's cellmate while he was awaiting trial. Gross testified that when the black prisoners, who were also housed in their cell, were out in the recreation area, Asay told him he was awaiting trial for a couple of murders. According to Gross, Asay then showed him some newspaper articles and told him, "I shot them niggers." While they were discussing the murders, Asay showed Gross his tattoos, which included a swastika, the words "White Pride," and the initials "SWP" which Gross said stand for supreme white power.
Asay was found guilty of both murders. In accordance with the jury's recommendations, the trial court imposed a sentence of death for each conviction. The following two aggravating factors were found in connection with both murders: 1) the murder was committed by a person under sentence of imprisonment because Asay was on parole; and 2) Asay had been previously convicted of a capital felony based on the contemporaneous murder conviction. § 921.141(5)(a), (b), Fla. Stat. (1987). In connection with the McDowell murder, the court found a third aggravating factor, that the murder was committed in a cold, calculated, and premeditated manner, without any pretense of any moral or legal justification. § 921.141(5)(i), Fla. Stat. (1987). Asay's age of twenty-three at the time of the offenses was found in mitigation as to both murders. § 921.141(6)(g), Fla. Stat. (1987).
Asay raises seven claims, only three of which merit discussion.[1]

GUILT PHASE
First, we address Asay's claim that the trial judge erred by failing to grant his motion for judgment of acquittal on count I of the indictment charging him with the first-degree premeditated murder of Robert Lee Booker. He contends that the conviction cannot be sustained because the state failed to prove the homicide was premeditated. He argues that, at best, the state proved second-degree murder because the testimony of the eyewitnesses merely establishes that he shot Booker one time during a brief heated argument and his admissions after the shooting show that he "harbored no intent to kill."
Premeditation is a fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act. Wilson v. State, 493 So.2d 1019, 1021 (Fla. 1986); Preston v. State, 444 So.2d 939, 944 (Fla. 1984). Whether a premeditated design to kill was formed prior to a killing is a question of fact for the jury that may be established by circumstantial evidence. 493 So.2d at 1021; 444 So.2d at 944.
On this record, there was sufficient evidence from which the jury could have concluded that, prior to discharging the fatal shot, Asay was conscious of the fact that he was going to shoot Booker and that Booker would likely die as a result of being shot. The evidence supports the jury's rejection of Asay's contention that the shooting was an "impulsive" reaction to the confrontation. See Forehand v. State, 126 Fla. 464, 171 So. 241 (1936) (first-degree murder conviction reduced to second degree where evidence supported conclusion that the defendant acted upon a "blind and unreasoning passion" in response to being hit with a blackjack by the victim). According to the testimony, Asay approached Booker with a gun concealed in his back pocket. He told Robbie that Robbie did not have "to take no s____t from these f____king niggers." Despite the fact that Robbie *613 told him that "everything [was] cool," Asay proceeded to pull the gun from his back pocket and shoot Booker in the abdomen. Bubba testified that Booker was not armed and was backing away at the time he was shot. In fact, it appears the only provocation for the shooting was Booker's demand that Asay stop putting his finger in Booker's face. As justification for his actions, Asay told Bubba "you got to show a nigger who is boss."
Based on Asay's statements, the nature of the wound inflicted, and the circumstances surrounding the shooting, the jury could have found that Asay made a conscious decision to shoot Booker to show the black man who was "boss," realizing the probable result of so doing. The fact that after Booker ran from the scene Asay told Bubba that he did not think he had killed Booker but merely had scared him does not preclude a finding of premeditation. Because there was substantial competent evidence from which the jury could have concluded, to the exclusion of all other inferences, that the killing of Booker was premeditated, the trial court properly denied Asay's motion for judgment of acquittal as to Count I. Wilson, 493 So.2d at 1022.
Although Asay does not challenge the sufficiency of the evidence supporting his conviction for the first-degree murder of Robert McDowell, our review of the record reveals sufficient competent evidence to support that conviction also.
Accordingly, finding no reversible error in connection with Asay's convictions, we affirm them.

PENALTY PHASE
Next we reject Asay's claim that the trial court erred in finding the McDowell murder was committed in a cold, calculated, and premeditated manner. While it is true that the simple premeditation necessary to support Asay's conviction of firstdegree murder is insufficient to support a finding that the murder was committed in a cold, calculated, and premeditated manner, we cannot agree that the state failed to establish the heightened premeditation required to support this aggravating factor. See Hamblen v. State, 527 So.2d 800 (Fla. 1988); Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988).
Although Asay and Bubba came upon McDowell by chance while looking for prostitutes, there was sufficient evidence from which it could be concluded that this murder was not the result of an "impulsive" spur-of-the-moment decision to kill made without reflection. This shooting occurred twenty minutes after Asay shot another black. Asay told Charlie Moore that while "looking for whores" with Bubba, he saw McDowell who had cheated him out of ten dollars on a drug deal and whom he previously had warned that "if he ever got him that he would get even." Moore's cousin testified that Asay also told Moore that his plan was to have Bubba get McDowell in the truck so they could "take her off and screw her and kill her." Moore testified that Asay told him that he left Bubba with McDowell and walked across the street to get a coke and to use the telephone. When he returned to the truck "Bubba still didn't have [McDowell] in the truck so they could go beat him up, so [Asay] just grabbed him by the arm and stuck the gun in his chest and shot him four times." Asay said that when McDowell "hit the ground, he finished him off." There was clearly sufficient evidence that Asay planned or prearranged to murder McDowell before he grabbed him by the arm and shot him repeatedly. See Thompson v. State, 565 So.2d 1311, 1318 (Fla. 1990) (to support this factor state must prove beyond a reasonable doubt that "defendant planned or prearranged to commit murder before the crime began"). The fact that the murder did not proceed as planned does not preclude a finding that it was accomplished in a calculated manner.
Finally, we reject Asay's claim that death is not proportionate for these murders because they were "spontaneous, impulsive killings during stressful circumstances" similar to killings which occur in domestic settings or in the felony murder context. See, e.g., Smalley v. State, 546 So.2d 720 (Fla. 1989) (death was inappropriate *614 where defendant killed girl friend's sick baby while baby-sitting but it was unlikely that defendant intended to kill baby and there was substantial mitigating evidence); Wilson v. State, 493 So.2d 1019 (Fla. 1986) (death sentence not proportionately warranted for murder of father during heated, domestic confrontation); Proffitt v. State, 510 So.2d 896 (Fla. 1987) (death penalty for murder committed when victim awoke during burglary of his residence was disproportionate where lack of prior criminal activity or violent behavior was found in mitigation); Caruthers v. State, 465 So.2d 496 (Fla. 1985) (death sentence for murder committed during robbery of convenience store disproportionate where there was one valid aggravating factor, that murder was committed while the defendant was engaged in the commission of an armed robbery, one statutory mitigating circumstance of no significant history of prior criminal activity, and several nonstatutory mitigating factors). The record does not support Asay's characterization of these murders and our review of prior death penalty cases leads us to conclude that death is the appropriate penalty as to both murders.
Accordingly, the convictions and sentences of death are affirmed.
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD, BARKETT, GRIMES and KOGAN, JJ., concur.
NOTES
[1] We find no merit to the following four claims: 1) the trial court erred by allowing racial prejudice to be injected into the trial; 2) the trial court erred in failing to advise Asay of his right to represent himself and to conduct an inquiry when Asay asked to discharge court-appointed counsel; 3) the trial court erred in denying Asay's pro se motion for a continuance of the penalty phase of the trial to enable him to secure additional mitigation witnesses; and 4) the prosecution improperly diminished the jury's role in sentencing.