PER CURIAM.
Justin Ryan McMillian appeals his conviction and sentence for the premeditated first-degree murder of Danielle Stubbs.[1] For the reasons stated below, we affirm.
I. BACKGROUND
The defendant, Justin McMillian, and his victim, Danielle Stubbs, began dating in the spring of 2008. On Wednesday or Thursday, January 6 or 7, 2009, Stubbs moved from an apartment into a nearby townhouse on Pineverde Lane in Jacksonville. McMillian assisted Stubbs and her family with the move. Friday afternoon, Stubbs took McMillian and her mother to lunch at Olive Garden as a thank-you for helping with the move. There, McMillian told Stubbs’ mother that he and Stubbs were breaking up, that he was quitting his job, and that he was going back to Georgia spend time with and take care of his two children.
Saturday night, Stubbs left her town-home and drove to a coworker’s apartment so that the two could then be driven by Allen Morris, another coworker, to a beachside nightclub. At the nightclub, Stubbs consumed several alcoholic beverages, became intoxicated, and, at some point, had sexual intercourse with Morris in the back of Morris’ car.
Morris, Stubbs, and the coworker left the nightclub around 2:45 a.m. on Sunday, January 11. Morris first drove the coworker back to his apartment and had to stop a couple of times on the way to allow Stubbs to vomit. After dropping off the coworker, Morris drove Stubbs home because she was too inebriated to drive her own car. A few minutes from Stubbs’ townhouse, at around 3:30 a.m., Morris stopped to get Stubbs something to eat in an effort to settle her stomach. From there, he drove Stubbs to her townhome. Initially, and at Stubbs’ request, Morris drove down Stubbs’ street past her townhouse, and stopped for a few minutes to allow Stubbs to eat some food and to compose herself. Morris then dropped Stubbs off in front of her townhouse, watched her walk past McMillian’s Cadillac, which was backed into Stubbs’ driveway, and drove away after she waved. Other than the defendant, Morris was the last person to see Stubbs alive.
Stubbs had plans with her mother during the day Sunday. When Stubbs’ family could not reach her by phone throughout the morning and into Sunday afternoon, they became increasingly alarmed and began to actively search for her by calling around to her friends and going to her townhome and recently emptied apartment. At one point that morning, McMilli-an called Stubbs’ mother to say that he could not find Stubbs and to inquire as to whether the family knew where she was. That evening, McMillian called again to say that he still could not find Stubbs. Stubbs’ parents and younger brother eventually called the police Sunday evening to report Stubbs missing and then drove to her townhome. Upon arriving and finding the front door locked, Stubbs’ father and *575 brother went around to the back of the townhome while Stubbs’ mother waited at the front door.
Stubbs’ brother and father discovered that the sliding glass door at the rear of Stubbs’ townhome was unlocked. Stubbs’ brother immediately went inside, ran upstairs, and began screaming. Stubbs’ father went to the front door, unlocked the doorknob and the deadbolt, let his wife in, and went upstairs with her. There, they found Stubbs dead in a pool of blood. She had been shot through the arm and the top of the head. Stubbs’ parents immediately called 911 and were waiting outside when the police, who were already en route due to Stubbs’ parents’ earlier call to report Stubbs missing, arrived minutes later.
The police recovered several important pieces of evidence from Stubbs’ bedroom. An unfired .45 caliber cartridge was found on the floor just inside the doorway to Stubbs’ bedroom. Further inside Stubbs’ bedroom, at the foot of her bed and beside her dresser/TV stand, a fired .45 caliber shell casing was recovered. Another fired .45 caliber shell casing was recovered from the floor beside Stubbs’ body on the side of the bed furthest from the bedroom door. Stubbs’ bedding was bloodstained and had holes in it which were consistent with being caused by fired bullets. A fired .45 caliber bullet, later matched to McMillian’s pistol, was also found lying on top of Stubbs’ bedding.
Stubbs’ autopsy confirmed that Stubbs was shot once through the right arm and once in the top of the head and was alive when both shots were fired. The shot to the head likely would have immediately rendered Stubbs unconscious and likely would have killed her within seconds, though it is possible that she survived for as long as a couple of minutes. The bullet that killed Stubbs was recovered from her skull and was later matched to McMillian’s gun.
The day after the murder, McMillian called the Jacksonville Sheriffs Office (JSO) and said that his girlfriend had been found dead in her apartment and he wanted to speak with someone about her case. He also said that he had been in Georgia since 3 a.m. the morning of the murder.[2] A detective called McMillian back shortly thereafter. In that conversation, McMilli-an stated that he had last seen Stubbs around 6 the night before the murder and had last spoken to her on the phone around 9 p.m., before she went out with her coworkers. McMillian also said that he was about to return to Jacksonville and would meet the detective at the station. When McMillian failed to show, the detective contacted a special task force to have him brought in.
Two days later, the task force saw McMillian and two other men leave a Jacksonville house in McMillian’s Cadillac. The task force followed McMillian, with an unmarked SUV initially leading several trailing task force vehicles. Shortly thereafter the lead was passed off from the SUV to a marked JSO K-9 unit so that a traffic stop could be initiated. Once the marked unit was behind McMillian, it turned on its lights and siren, but McMilli-an continued driving as though nothing were happening. After a short distance, McMillian turned onto a side street and abruptly stopped without pulling off the road. As McMillian was coming to a stop, the two passengers opened the passenger *576 side car doors and ran a short distance from the vehicle before going to the ground.
At this point, as the K-9 officer was getting out of his patrol car, McMillian exited his vehicle, reached behind his back, pulled a .45 caliber semi-automatic pistol, and began to fire at the K-9 officer. The K-9 officer exited his patrol car with his dog on its leash, leading him out the door. When he realized that McMillian was shooting at him, the K-9 officer took cover behind his door and deployed the K-9. However, because the K-9 was facing the wrong direction when deployed, it ran to the rear of the patrol car and engaged another task force member who had been in a trailing vehicle. The task force members returned fee at McMillian as he feed and fled from his car on foot. McMillian ran a short distance down the street and then ran between two houses, causing the task force members to lose sight of him. McMillian was found between those two houses, having collapsed due to multiple gunshot wounds.
Police recovered several pieces of evidence from the scene of the shootout, including McMillian’s semiautomatic .45 caliber Desert Eagle pistol, two .45 caliber bullets which struck the JSO K-9 patrol car in the driver’s side headlight and in the driver’s door, an unfeed .45 cartridge, and spent .45 shell casings.
From the evidence collected at the scenes of the shootout and Stubbs’ murder, it was determined that McMillian’s gun was used to murder Stubbs. During the course of their investigation into Stubbs’ murder, police also obtained a security video from a convenience store near Stubbs’ townhome as well as phone records for Stubbs’ cell phone and the convenience store pay phone. The video and records show that on the morning of Stubbs’ murder, at around 4:05 a.m., McMillian entered the store, got change, and used the pay phone to make two calls, each of which lasted approximately one minute, to Stubbs’ cell phone. The records also show that Stubbs made a two-second long return call from her cell phone to McMillian at the pay phone at approximately 4:08 a.m.
A couple of weeks after the shootout, two detectives from Stubbs’ murder investigation went to the hospital to interview McMillian.[3] Prior to going in to see McMillian, the detective spoke to a nurse, who stated that the only medication McMillian was receiving was Motrin.[4] After waiving his Miranda[5] rights, McMillian first repeated his story that the last time he saw Stubbs was on Saturday evening before she went out with her coworkers and that he had gone to a bar with his sister, left the bar around 1:30 a.m., drove his sister home, and left for Georgia around 2:00 a.m. The detectives then told McMillian that their investigation had determined that his gun was the same gun used to kill Stubbs. McMillian then admitted that he was sitting in his car in Stubbs’ driveway when she came home and claimed that he went inside with her. McMillian claimed that he and Stubbs had intercourse on her couch and then went upstairs and got in bed. McMillian then claimed that was when he “lost it” and stated that he shot Stubbs while she was sleeping in the bed, and then shot her again after she rolled out of the bed and onto the floor on the far side of the bed. *577 McMillian also said that he knew that Stubbs was dead when he left the apartment and that her body was on the side of the bed farthest from the bedroom door. McMillian also stated that he did not have his own key to the townhome and that after shooting Stubbs, he went out the front door and closed it behind him.
In his guilt phase defense, McMillian testified differently. He stated that he had spent the day before the murder at a racetrack in Valdosta and returned to Stubbs’ townhome around 5 p.m. He claimed that he and Stubbs had intercourse, he left, and Stubbs went out with coworkers. Later that night, he went to a bar with his sister and took her home around 2:30 or 3 a.m. After dropping off his sister, McMillian drove to Stubbs’ townhome because he had some belongings that he wanted to pick up before leaving for Georgia. McMillian claimed that he was sitting in his car in Stubbs’ driveway when Stubbs got home, that she invited him inside, and that they again had intercourse on her couch before going upstairs. McMillian claimed that, once upstairs, Stubbs got upset about his plans to leave to see his children in Georgia and then to return to work as a contractor in Iraq. McMillian claimed that Stubbs then told him that she had slept -with the coworker who had dropped her off earlier that night, which upset but did not anger him. McMillian claimed that the two lay in the bed for a while before he got up to get dressed and leave for Georgia. McMillian testified that, on his way out the bedroom door, he grabbed his pistol from the dresser/TV stand beside the bedroom door and put it in his waistband. Finally, McMillian claimed that as he was leaving, Stubbs said that she had known he would leave and had aborted his unborn child, which caused him to pull his gun and fire toward the bed in the darkness. When asked about the convenience store video, McMillian claimed that he panicked, left out the front door, drove to the convenience store, called Stubbs to see if she was okay, did not get an answer, and then left for Georgia.
On cross-examination, the State attempted to elicit further details from McMillian regarding how he came to shoot Stubbs. McMillian stated that he did not have to load his gun before firing because he always kept it loaded and that all the shots were fired from the doorway. McMillian also admitted that the first time he had mentioned Stubbs’ abortion was during the trial, which was after he had seen a receipt for an abortion that the police recovered from Stubbs’ purse at the murder scene.
After hearing the prosecution’s case in rebuttal[6] and closing arguments, the jury found McMillian of guilty of premeditated first-degree murder for the killing of Danielle Stubbs and of attempted second-degree murder for shooting at the K-9 officer.
McMillian’s penalty phase was held June 30, 2010. There, the prosecution established that, at the time of Stubbs’ murder, McMillian was approximately one year into a five-year term of felony probation stemming from an incident in Georgia in which *578 McMillian fled police, who were attempting to pull him over,[7] at speeds up to 120 m.p.h. through a residential neighborhood and nearly ran over a child.[8] McMillian’s judgment and sentence were introduced into evidence.
In mitigation, McMillian first presented Dr. Krop, a mental health expert, who testified that he had met with McMillian on several occasions, met with McMillian’s family, read depositions related to the case, and reviewed medical and school records and police reports. Dr. Krop also conducted a battery of psychological and neuropsychological testing on McMillian which revealed that McMillian had mild to moderate impairment of his frontal lobe function. However, Dr. Krop could not state whether these impairments predated the murder because they could have been caused by blood loss or a shot to the head that McMillian suffered in his shootout with police. Dr. Krop also testified that there were records that McMillian had sustained a concussion without loss of consciousness in a 2006 car crash, but that CAT scans taken at the time were negative for physical brain damage. He also explained that McMillian was in the borderline range of mental function with an IQ of 76 and had abused alcohol in the year leading up to the murder. Ultimately, Dr. Krop stated that he did not believe that McMillian suffered from any diagnosable mental illness or psychiatric disorder,[9] but did believe the shooting was caused by McMillian reacting while in a highly emotional state.
On cross-examination, Dr. Krop stated that McMillian lied to him in their initial interview and denied responsibility for Stubbs’ murder by claiming that he arrived at Stubbs’ house, found her dead, took his gun from the bed, and fled. However, in a subsequent interview, McMillian gave Dr. Krop another version of events. This time, McMillian explained that he had gone to Stubbs’ house after dropping off his sister in order to retrieve his gun before leaving for Georgia. McMillian then stated that he retrieved his gun from upstairs, placed it in his waistband, and was outside in his car drinking and smoking marijuana when Stubbs came home. He claimed that he and Stubbs argued in the driveway about his leaving for Georgia and that he was going to leave Stubbs’ townhome but could not because Stubbs took his keys and went inside. He then claimed that Stubbs called him on his cell phone and told him to come upstairs and that when he went upstairs, he found Stubbs on her bed and dressed in lingerie. McMillian claimed that Stubbs told him that he needed to figure out what he wanted. McMillian then asked Stubbs about the coworker who had dropped her off and she told him that, while she had slept with the coworker a couple of times, things were not serious. McMillian claimed that, upon being told by Stubbs that she had slept with the coworker, he pulled his gun from his waistline, shot Stubbs while she was on the bed, and shot her again after she had rolled from the bed to the floor. *579 McMillian claimed that he then attempted to shoot himself, but discharged the bullet instead.
McMillian’s father testified that he had obtained custody of McMillian from McMillian’s biological mother because she could not care for him adequately and that McMillian grew up feeling that his mother did not love him or care for him as much as she should. McMillian’s father also testified that, while McMillian could have had learning disabilities as a child, the fact was never determined conclusively because McMillian’s father did not believe in them. He also explained that McMillian struggled in school and that he was able to get an expulsion, imposed for fighting, rescinded so that McMillian could transfer to a Georgia high school and graduate. Other family members and friends testified that McMillian is very close with and is dearly loved by his family and also is a good father who loves his children and who would continue to play a positive role in their lives from prison. Following the defense’s presentation of mitigation evidence, the jury recommended death by a vote of 10-2.
A Spencer[10] hearing was held August 27, 2010, but neither side presented any additional information. On October 1, 2010, the trial court, following the jury’s recommendation, sentenced McMillian to death based on its determination that that the two established aggravators[11] outweighed one statutory mitigator[12] and seven non-statutory mitigators.[13] This appeal followed.
II. ISSUES ON APPEAL
On appeal, McMillian argues that the trial court erred in denying his motion for a judgment of acquittal for premeditated first-degree murder and that his death sentence is disproportionate.[14] We also review whether sufficient evidence was presented to support McMillian’s conviction for premeditated first-degree murder. As explained below, we find that McMillian is entitled to no relief.
A. Denial of Motion for Judgment of Acquittal
At the conclusion of the prosecution’s case, the defense moved for a judgment of acquittal, arguing that insufficient evidence *580 had been presented to convict McMillian of either premeditated first-degree murder or first-degree felony murder.[15] The defense then presented its case and moved again for a judgment of acquittal after the prosecution’s case in rebuttal. Both motions were denied. McMillian now argues that the trial court erred in denying his motion for judgment of acquittal because the State did not carry its burden of establishing premeditation. We disagree.
Premeditation “is a fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act.” Miller v. State, 42 So.3d 204, 228 (Fla.2010) (quoting Asay v. State, 580 So.2d 610, 612 (Fla.1991)). “Circumstantial evidence of premeditation can include the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.” Pearce v. State, 880 So.2d 561, 572 (Fla.2004) (citing Spencer v. State, 645 So.2d 377, 381 (Fla.1994); Holton v. State, 573 So.2d 284, 289 (Fla.1990)).
“Premeditation is a factual issue for the jury, Asay v. State, 580 So.2d 610, 612 (Fla.1991), and several standards of review are applicable.” Twilegar v. State, 42 So.3d 177, 190 (Fla.2010), cert, denied, — U.S. -, 131 S.Ct. 1476, 179 L.Ed.2d 315 (2011). Where direct evidence of premeditation is presented, the “jury’s finding of premeditation will be sustained if supported by competent, substantial evidence in the record.” Id. However, in a case where the evidence of premeditation is entirely circumstantial, “not only must the evidence be sufficient to support the finding of premeditation, but the evidence, when viewed in the light most favorable to the State, must also be inconsistent with any other reasonable inference.” Id.
Even assuming arguendo that the circumstantial evidence rule applies, we still conclude that McMillian has failed to demonstrate that the trial court erred.
McMillian now claims that he snapped during a heated, emotional confrontation and killed Stubbs with a weapon of convenience shortly after she had returned home from having sexual intercourse with another man. He further argues that the prosecution failed to present competent, substantial evidence that is inconsistent with this reasonable inference. However, we find that competent, substantial evidence which is inconsistent with McMillian’s theory was presented. First, the prosecution introduced the transcript of McMillian’s hospital confession and played a tape of that confession for the jury. In that confession, McMillian stated that he and Stubbs were not arguing and were not fighting after she got home. McMillian’s hospital confession, therefore, is inconsistent with his asserted theory because it cannot be reconciled with his claim that he killed Stubbs during a heated, emotional confrontation.
Additionally, McMillian’s own guilt phase testimony is inconsistent with his claim of a non-premeditated murder. During his guilt phase testimony, McMilli-an testified that he was upset, but not angry, when Stubbs admitted to him that she had sexual intercourse with the coworker who brought her home that night. McMillian also testified that he shot *581 Stubbs as a result of her telling him she had aborted his unborn child. McMillian’s testimony therefore is also inconsistent with his asserted theory because it directly contradicts both the emotional state he now claims to have been in regarding Stubbs sleeping with her coworker and the statement that Stubbs allegedly made to cause him to “snap.”
Finally, the prosecution presented testimony that an unfired .45 caliber cartridge and two fired .45 shell casings were recovered in a “trail” beginning in Stubbs’ bedroom doorway and ending beside Stubbs’ body. The “trail” formed by the cartridge and shell casings is also inconsistent with any other reasonable inference because, contrary to McMillian’s claim that he snapped and shot Stubbs from her bedroom doorway, it is evident that McMillian entered Stubbs’ bedroom, first shot Stubbs through the arm, then moved around to the far side of Stubbs’ bed and shot her through the top of the head.[16]
We also find that competent, substantial evidence supports the jury’s finding of premeditation. Based on the crime scene evidence, the nature of Stubbs’ wounds and the manner in which they would have been inflicted, the jury could have reasonably determined that McMillian committed premeditated murder. See Pearce v. State, 880 So.2d 561, 572 (Fla.2004) (“Circumstantial evidence of premeditation can include the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.”) (emphasis added) (citing Spencer v. State, 645 So.2d 377, 381 (Fla.1994); Holton v. State, 573 So.2d 284, 289 (Fla.1990)); see also Asay, 580 So.2d at 613 (“Based on Asay’s statements, the nature of the wound inflicted, and the circumstances surrounding the shooting, the jury could have found that Asay made a conscious decision to shoot Booker ... realizing the probable result of so doing.”).
Accordingly, McMillian has failed to demonstrate that the trial court erred in determining that the evidence was sufficient to support premeditation.
B. Proportionality
Regardless of whether the defendant raises the issue, “[t]his Court must review the proportionality of a death sentence.” Bolin v. State, 869 So.2d 1196, 1204 (Fla.2004). The death penalty is intended for those cases in which “the most aggravating and least mitigating circumstances exist.” Terry v. State, 668 So.2d 954, 965 (Fla.1996) (citing Kramer v. State, 619 So.2d 274, 278 (Fla.1993); State v. Dixon, 283 So.2d 1, 7 (Fla.1973)). This Court’s review “ ‘is not a comparison between the number of aggravating and mitigating circumstances.’ ” Crook v. State, 908 So.2d 350, 356 (Fla.2005) (quoting Urbin v. State, 714 So.2d 411, 416 (Fla.1998)). Rather, this Court considers the totality of the circumstances to determine if death is warranted in comparison with other cases in which the death penalty was upheld. Id.
This case involves a premeditated shooting murder and a very serious attempted *582 shooting murder of a uniformed police officer by a felon who, by the terms of his probation, was forbidden from possessing a firearm. The jury recommended death by a vote of 10-2. The trial court found two aggravating circumstances: (1) McMil-lian was on felony probation at the time of the murder (great weight); and (2) McMil-lian was convicted of a prior violent felony based on his conviction at trial for the attempted murder of a law enforcement officer (great weight). The trial court also found the following mitigators: (1) no significant history of prior criminal activity (little weight); (2) McMillian was raised in the church as a child (very slight weight); (3) McMillian loves and is loved by his family and friends (little weight); (4) McMillian has a consistent history of employment (little weight); (5) McMillian’s biological mother was not an active participant in his upbringing (slight weight); (6) McMillian has an IQ of 76 (little weight); (7) McMillian behaved appropriately during trial (slight weight); and (8) McMillian suffered from some mental or emotional distress at the time of the murder (some weight).
We have found the death penalty to be a proportionate sentence where the totality of the circumstances were similar to those present here. For example, we have found death to be a proportionate sentence in cases which have similarly involved a shooting death following domestic disputes over sexual infidelity. See Rodgers v. State, 948 So.2d 655 (Fla.2006) (affirming death sentence for defendant who caught his wife cheating and fatally shot her in the head later that day where the trial court determined that one aggravator-pri- or violent felony, based on a 1963 robbery and a 1979 manslaughter conviction-outweighed five nonstatutory mitigators, including that the defendant had borderline intelligence at best); Evans v. State, 838 So.2d 1090 (Fla.2002) (affirming death sentence as applied to defendant who fatally shot brother’s girlfriend in the course of an argument over her alleged infidelity based on the trial court’s determination that two aggravators — prior violent felony and felony probation — outweighed several nonstat-utory mitigators including a deprived childhood as a result' of mother’s crack addiction, exemplary work habits, and performing charitable and humanitarian work). And we have upheld the death penalty as proportionate in cases which have involved a similar mix of one or two weighty aggravators and comparatively weak mitigators. See Bailey v. State, 998 So.2d 545 (Fla.2008) (affirming death sentence as applied to a defendant who fatally shot a police officer during a traffic stop based on trial court’s determination that two weighty aggravators (avoid arrest and felony probation) outweighed the statutory age mitigator (very little weight) and eight nonstatutory mitigators including low IQ, history of mental illness, intoxication, and coming from a broken home (little weight as to each)); Blackwood v. State, 777 So.2d 399 (Fla.2000) (affirming death penalty as proportionate based on a lone HAC aggra-vator and a mix of mitigators that was very similar to McMillian’s, including the statutory mitigator of no significant criminal history, and nonstatutory mitigators of emotional disturbance at time of murder, murder as a result of a lover’s quarrel, low IQ, defendant being a good parent, and employment history); Pope v. State, 679 So.2d 710 (Fla.1996) (affirming death penalty as to defendant who fatally beat and stabbed his girlfriend, based on the trial court’s determination that the prior violent felony and pecuniary gain aggravators outweighed both statutory mental health mit-igators and several nonstatutory miti-gators, including intoxication at the time of the murder and fighting with the victim girlfriend just before the murder).
McMillian argues that, because his prior violent felony resulted from a crime *583 committed after Stubbs’ murder, it should be afforded less weight. In support, McMillian relies on Urbin v. State, 714 So.2d 411 (Fla.1998) (striking the death penalty as applied to defendant who was seventeen at the time of the murder, whose ability to appreciate the criminality of his conduct was substantially impaired, and who suffered extensive parental abuse and neglect and also noting, in a single sentence, that Urbin’s qualifying prior violent felony was based on a robbery that occurred two weeks after the murder at issue). Here, due to the exceedingly serious nature of McMillian’s qualifying prior violent felony-McMillian, a convicted felon who was forbidden from possessing a firearm under the terms of his probation, attempted to murder a uniformed law enforcement officer with a firearm and engaged in a running shootout with the police in the middle of a residential neighborhood we find that McMillian’s prior violent felony aggravator is unquestionably entitled to great weight.
Accordingly, we find that death is a proportionate sentence in McMillian’s case.
C. Sufficiency of the Evidence
 Regardless of whether the parties raise the issue, this Court independently reviews the record of a death penalty case to determine whether the evidence is sufficient to support the murder conviction. See Winkles v. State, 894 So.2d 842, 847 (Fla.2005). Here, there is competent, substantial evidence to support McMilli-an’s conviction for first-degree murder.
In his hospital confession, McMillian admitted that he first shot Stubbs while she was in bed and then shot her again after she rolled out of bed and onto the floor. Evidence from Stubbs’ bedroom and the medical examiner’s testimony is consistent with Stubbs being shot through the arm while in her bed, rolling to the floor on the side of the bed opposite the bedroom doorway, and then being shot again through the top of the head. Further, the “trail” formed by the unfired .45 caliber cartridge in Stubbs’ bedroom doorway and the two shell casings found at the foot of the bed and right beside Stubbs’ body could be seen as indicating that McMillian entered Stubbs’ bedroom, recocked his already loaded gun so as to cause an unfired .45 caliber cartridge to be ejected, walked to the foot of Stubbs’ bed, shot her in the arm, and then moved to where Stubbs had rolled to the floor on the far side of the bed before shooting her again in the top of the head. Moreover, the location of the fatal gun — shot to the top of Stubbs’ head — supports a determination that McMillian intended to kill Stubbs. See Pearce, 880 So.2d at 572 (“[C]ircumstantial evidence of premeditation can include ... the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.”).
Based on the foregoing, we find that competent, substantial evidence supports McMillian’s conviction for premeditated first-degree murder.
III. CONCLUSION
For the reasons expressed above, we affirm McMillian’s conviction and sentence of death for the premeditated first-degree murder of Danielle Stubbs.
It is so ordered.
CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.

. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

. McMillian has given at least five different accounts of events relating to Stubbs’ murder; three were made to police, recorded, and played at trial; one was given when McMilli-an testified in his own defense; one was introduced through the testimony of Dr. Krop during the penalty phase. No two are wholly consistent with each other, and none of them can be fully reconciled with the evidence.

. This interview was recorded and was played for the jury during trial and a transcript of the interview was admitted into evidence.

. McMillian independently confirmed that he was only receiving Motrin.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. During its rebuttal, the state played a recording of a police interview of McMillian, taken at McMillian’s request, from January of 2010. In this interview, McMillian claimed that he had not killed Stubbs. Instead, McMillian claimed that he had returned to Stubbs’ townhome, went inside, found her dead, saw his gun on the bed, took the gun, and left because he knew it would look like he killed her. Notably, in this interview, McMil-lian was able to describe where Stubbs' body was located and how it was directionally oriented within her bedroom. This is contrary to the story McMillian told at trial, in which he claimed that he had fired into the darkness without knowing where Stubbs was and had immediately left.

. The Georgia town’s police knew McMillian by name and knew him to habitually drive with a suspended license.

. Because police knew who McMillian was and because of the danger involved in chasing him through neighborhoods, they called off the chase and attempted to locate McMillian through other means. Later, McMillian came to the police station and attempted to report his vehicle stolen. When police threatened him with a charge of filing a false police report, McMillian confessed that he was the driver and then bragged about having gotten away. McMillian's stated reason for fleeing was that he was unlawfully in possession of a firearm and narcotics.

.Dr. Krop did note that McMillian was diagnosed as having ADD as a child, but stated that he would not diagnose McMillian as having the disorder as an adult.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. The aggravators were prior violent felony based on McMillian's conviction for attempted second-degree murder for shooting at a police officer (great weight) and felony probation stemming from McMillian’s felony fleeing and eluding offense in Georgia (great weight).

. The trial court found that McMillian did not have a significant history of prior criminal activity and gave this mitigator “little weight.” The trial court explained that evidence was presented throughout both phases of the trial that McMillian had a history of fighting in school, was regularly in trouble with police for driving with a suspended license, and had a felony fleeing and eluding charge. The trial court stated that "the Defendant's prior criminal activity, while not in the nature of violent felony convictions, substantially reduces the weight of this mitigating circumstance.”

. The trial court found that: (1) McMillian was raised in the church (very slight weight); (2) McMillian loves and is loved by his family and friends (little weight); (3) McMillian has a consistent history of employment (little weight); (4) McMillian’s biological mother was not an active participant in his upbringing (slight weight); (5) McMillian has an IQ of 76 (little weight); (6) McMillian behaved appropriately during trial (slight weight); (7) McMillian suffered from some mental or emotional distress at the time of the murder (some weight).

. McMillian also claims that the trial court abused its discretion by assigning great weight to his felony probation aggravator and that Florida’s death penalty statute violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We reject both claims as meritless.

. The prosecution presented two theories to support its first-degree murder charge: that the murder was premeditated or that the murder was a qualifying felony murder based on an underlying burglary and/or sexual assault. The jury specifically found McMillian guilty of premeditated first-degree murder.

. McMillian claims that, based on the medical examiner’s testimony, there is no way to determine which shot was fired first. McMil-lian misconstrues the testimony; the medical examiner stated that, based on the autopsy alone, he could not determine which shot was fired first. When the totality of the evidence is considered, including McMillian’s admissions, the bullet that passed through Stubbs' arm being recovered from her bed, and the medical examiner's testimony that Stubbs likely would have been rendered immediately unconscious and likely would have died within seconds of being shot in the head, it is clear that McMillian’s first shot was to Stubbs’ arm.