# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

———————————————

No. 1D2023-2714

———————————————

ANTHONY MALACHI MCINNIS,

    Appellant,

    v.

STATE OF FLORIDA,

    Appellee.

———————————————

On appeal from the Circuit Court for Leon County.
Joshua M. Hawkes, Judge.

April 16, 2025

ON MOTION FOR REHEARING

ROWE, J.

McInnis moved for rehearing of our decision in this appeal. *See McInnis v. State,* No. 1D23-2714, 2025 WL 699793 (Fla. 1st DCA Mar. 5, 2025). We deny the motion. But on our motion, we grant clarification of the opinion, and substitute the following opinion in its place.

Anthony Malachi McInnis appeals his judgment and sentence for first-degree murder and theft. McInnis argues that the trial court erred when it: (1) denied his motion for judgment of acquittal, (2) instructed the jury on the aggressor portion of the standard jury instruction for justifiable use of deadly force, and (3) overruled his objection to the State's comments during closing arguments. We

affirm on all issues and write only to address the trial court's ruling on the motion for judgment of acquittal.

*Facts*

McInnis and the victim were friends. McInnis visited the victim's apartment several times a week to play video games, watch television, smoke marijuana, and discuss relationships. The pair also engaged in a joint venture to sell marijuana, with McInnis acting as a middleman between the victim and his distributor. But the friendship began to sour in the weeks before the victim's death. Although McInnis complained to his then-girlfriend and their shared roommate about the victim, he pretended to remain friends with the victim.

On the day of the shooting, McInnis drove to the victim's apartment in a red sedan rented by McInnis' girlfriend. Earlier in the day, McInnis texted his girlfriend that he was "about to do some hot shit" and asked her to pray for him. Around noon, when the victim's friend arrived at the apartment to buy marijuana, he observed that the door to the apartment was uncharacteristically locked and a bright red sedan was parked near the entrance to the apartment. That evening, the victim's next-door neighbor heard a loud "thud" from the victim's apartment. The neighbor peered out the window and saw McInnis move a backpack from the victim's car into the red sedan and then return to the apartment. A few minutes passed before the neighbor saw McInnis leave the apartment again.

Hours later, the victim's former girlfriend stopped by the apartment to pick up some of her belongings. She found the victim, lying motionless on the bed. She left the apartment, and then called 911 reporting an emergency before hanging up. Officers responded to the apartment and found the victim lying on his bed in a relaxed position, with his right hand resting under his head, legs over the edge of the bed, facing the still-playing television. The victim had been shot twice through the right side of his head. His belongings appeared to have been rummaged through—drawers from his dresser sat on the bed and his belongings were strewn about the apartment. His Apple watch, cell phone, jewelry, locked safe, and security camera were missing from the apartment.

2

Investigators suspected that McInnis was the shooter. Witnesses told the investigators that McInnis was angry with the victim for cutting him out of the marijuana venture and that McInnis' behavior was unusual on the day of the shooting. They reported that McInnis and his girlfriend had rented a red sedan matching the description of the car parked outside the victim's apartment on the day of the shooting.

Investigators interviewed McInnis' roommate. A few weeks after the shooting, she saw a black and beige handgun, an Apple watch, and loose marijuana in the kitchen of the apartment she shared with McInnis. She recognized the Apple watch as similar to the victim's watch that was missing from his apartment after the shooting. The roommate left the kitchen for a few minutes, and when she returned, the items were gone. She then saw McInnis walking out of the apartment with a trash can.

At the same time, undercover officers from the narcotics unit were surveilling McInnis' apartment. Officers spotted McInnis leaving the apartment with the trash can. Fearing that McInnis was trying to dispose of evidence from the ongoing homicide investigation, officers moved to detain him. McInnis fled on foot after officers identified themselves as law enforcement and ordered him to stop. Officers tased McInnis and took him in for questioning.

Detectives Sherrie Bennett and Nick Roberts interviewed McInnis. At first, McInnis claimed that he last saw the victim the day before the shooting. McInnis stated that his girlfriend picked him up from the victim's apartment in a black SUV rental. When pressed about the red sedan parked outside the victim's apartment on the day of the shooting, McInnis changed his story. He admitted that he was at the victim's apartment on the day of the shooting, but he alleged that one of the victim's customers shot the victim while McInnis was outside the apartment.

The detectives challenged McInnis' explanation and confronted him with information that witnesses identified McInnis as the only person seen leaving the victim's apartment after the shooting. McInnis finally admitted that he shot the victim—but he

3

claimed that he acted in self-defense. McInnis stated that after hours of smoking marijuana and taking prescription pills, the victim became erratic and angry. The victim was sitting on the bed and began waving a gun at him while threatening to sexually assault McInnis and his girlfriend (who was not present). As the interview continued, McInnis kept changing his account of whether the victim was pointing a gun at him when McInnis fired the gun. When pressed about his conflicting accounts of the incident, McInnis confessed that the shooting was not "an immediate . . . self-defense, but it was self-defense in a sense." He admitted that he knew where the victim kept his money and safe and that he stole two guns, jewelry, cash, marijuana, the Apple watch, a cellphone, and the locked safe.

While McInnis was being interrogated, officers executed a search warrant on McInnis' apartment. They found the missing Apple watch, the victim's jewelry, cash, loose marijuana, and a Recon FMK 9mm semiautomatic handgun. The State charged McInnis with first-degree murder and armed robbery.

*Trial*

The State presented testimony from several witnesses, including police officers, forensic analysts, and the medical examiner. Officer White testified that when he responded to the 911 call and entered the victim's apartment, he saw smoke and smelled a strong odor of freshly burnt marijuana. The victim was lying on the bed with his right hand behind his head and his left hand near his waistband. White noticed that the dresser drawers had been pulled out and saw a laptop on the victim's bed. The State published White's body-worn camera footage for the jury.

Forensic analyst Jack Williams collected and documented a spent casing and the bullet fired into the victim. He located the casing on the victim's bed and the bullet under a bloody pillow the victim's head was resting on. FDLE analyst Elizabeth Richey testified that she matched the casing and bullet recovered from the victim's apartment to the semiautomatic handgun seized during the search of McInnis' apartment.

4

Dr. Anthony Clark performed the autopsy on the victim. The victim tested positive for marijuana and oxymorphone, a narcotic painkiller. Clark noted the presence of blood spatter on the victim's left palm, indicating that when he was shot, the victim's hand was open and situated near his shoulder. Clark identified two gunshot wounds—one above the victim's right ear and another in the right cheek. Both bullets passed through the victim's skull. Based on the trajectory of the bullets, Dr. Clark opined that the victim was shot from above while lying down, looking away from the gun, and not holding anything in his left hand. The State also published McInnis' interview with Detectives Bennett and Roberts.

McInnis then moved for a judgment of acquittal on both charges. He argued the State failed to present any evidence that McInnis intended to shoot the victim or steal his belongings. The State responded by highlighting the text message McInnis sent to his girlfriend before the shooting, witness testimony on McInnis' anger toward the victim, and McInnis' admission that he knew where the victim kept his valuables. The State argued these facts were evidence of either premeditated murder or an intent to commit armed robbery, which would support a felony murder conviction. The court granted McInnis' motion on the armed robbery charge but denied the motion on the first-degree murder charge.

McInnis testified. He maintained that the victim was his friend and denied having a disagreement with the victim over their marijuana venture. On the day of the shooting, the victim invited him over to the apartment to smoke marijuana, play video games, and watch television. McInnis explained that the text he sent to his girlfriend earlier in the day about doing "hot shit" was in reference to smoking a lot of marijuana. He brought a tablet, cash, and a pound of marijuana to the victim's apartment. McInnis and the victim smoked marijuana all day long until the victim grew angry with McInnis. McInnis tried to calm the victim down. But the victim began waving a gun around while threatening to rape McInnis' girlfriend and assault McInnis with the gun. McInnis claimed that when he tried to leave the apartment, the victim pointed the gun directly at him and told him to sit down. McInnis responded by pulling his own gun and shooting the victim. McInnis then retrieved his belongings by swiping them off the dresser.

McInnis denied that he took the safe, went through the victim's car, or that he intended to steal the victim's belongings.

When the State cross-examined McInnis about why his trial testimony differed from his confession, McInnis replied that he had taken LSD before his interrogation. The State asked McInnis how he ended up with the victim's money and jewelry; McInnis suggested he may have inadvertently included some of the victim's belongings while quickly swiping his own belongings off the dresser. McInnis maintained that the victim held the gun in his left hand during the altercation.

The jury found McInnis guilty of first-degree murder and theft, with a special finding that the stolen items included a firearm. McInnis moved for a new trial and renewed his motion for judgment of acquittal, challenging the sufficiency of the State's evidence that he acted with premeditation. The trial court denied both motions. The trial court sentenced McInnis to concurrent terms of life in prison for first-degree murder and to five years in prison for theft. This timely appeal follows.

*Analysis*

McInnis argues that the trial court erred when it denied his motion for judgment of acquittal on the first-degree murder count because the State failed to present sufficient evidence to prove that McInnis acted with premeditation when he shot the victim.

We review de novo a trial court's ruling on a motion for judgment of acquittal. *Bradwell v. State,* 300 So. 3d 325, 327 (Fla. 1st DCA 2020). We will uphold the trial court's ruling if it is supported by competent, substantial evidence. *Walker v. State*, 957 So. 2d 560, 577 (Fla. 2007). We view the evidence in the light most favorable to the State and consider whether the trier of fact could find the elements of the charged offense beyond a reasonable doubt. *Taylor v. State,* 316 So. 3d 420, 426 (Fla. 1st DCA 2021).

To prove first-degree murder, the State must show that the unlawful killing of a person was "perpetrated from a premeditated design to effect the death of the person killed[.]" § 782.04(1)(a)1., Fla. Stat. (2020). "Premeditation is a fully formed conscious

purpose to kill" that need only last long enough for the accused to reflect on the nature of the act and its likely outcome. *Twilegar v. State*, 42 So. 3d 177, 190 (Fla. 2010). Whether a killing was premeditated is a question of fact for the jury. *Id.* It may be inferred from evidence such as the type of weapon used, absence or presence of provocation, previous difficulties between the parties, and forensic evidence of the victim's wounds and crime scene. *McMillian v. State*, 94 So. 3d 572, 581 (Fla. 2012). The State established that McInnis acted with premeditation through evidence of the souring relationship between McInnis and the victim, forensic evidence from the victim's wounds, and other evidence from the crime scene.

There was testimony that the relationship between McInnis and the victim soured before the shooting. And hours before the shooting, McInnis texted his girlfriend, asking for her prayers because he was about to do something dangerous. McInnis' anger combined with the incriminating text show McInnis harbored an intent to kill the victim while in his home under the guise of friendship. *See Asay v. State*, 580 So. 2d 610, 612 (Fla. 1991).

The position of the victim when he was discovered by police and other physical evidence collected from the apartment also show that the shooting was premeditated. McInnis maintained that he shot the victim in self-defense because the victim sat upright, held a gun in his left hand, and pointed it at McInnis, compelling McInnis to shoot in self-defense. But police discovered the victim lying down on his bed with his head resting on his right palm in a sleeping position. Had the victim been sitting upright, facing McInnis mid-argument, his body could not have landed in a supine position facing the other direction. *See McMillian*, 94 So. 3d at 581 (finding crime scene evidence and the way the victim's injuries would have been inflicted were evidence of premeditation).

The blood spatter evidence also suggests premeditation. *Beasley v. State,* 774 So. 2d 649, 660 (Fla. 2000) (finding blood spatter patterns evidence of premeditation). Investigators found blood-soaked pillows where the victim's head rested. But they found no blood spatter on the wall behind the victim. Had the victim been shot while sitting upright on the bed—as McInnis claimed—blood would have spattered the wall behind the victim's

7

head. Blood spatter was also found on the victim's left palm and fingers. Expert testimony established that no blood spatter would have appeared on the victim's left hand had his hand been closed around a gun—as McInnis claimed.

Evidence of the bullets' trajectories also show premeditation. McInnis shot the victim twice. He fired the gun from an upward right angle, suggesting McInnis stood above and to the side of the victim as he was lying down. The bullets entered the victim's skull from the right, exited from the left, and completed a downward path, settling under his pillow. The entry points were only eight centimeters apart, indicating McInnis acted with precision. Had the victim been sitting upright and arguing with McInnis when he was shot, the bullets would have travelled into the wall, rather than under the victim. McInnis' precision in his aim and the angle from which he shot the victim show that he acted with intent to kill. *Twilegar*, 42 So. 3d at 191 (finding evidence of the victim being shot at close range from a downward angle showed premeditation); *Asay,* 580 So. 2d at 612.

In sum, physical and forensic evidence along with witness testimony support the trial court's conclusion that McInnis acted with premeditation when he shot and killed the victim. And so, the trial court did not err when it denied the motion for judgment of acquittal. Finding no error by the trial court as to any issue raised on appeal, we AFFIRM the judgment and sentence.

WINOKUR and NORDBY, JJ., concur.

––––––––––––––––––––––––––

*__Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.__*

––––––––––––––––––––––––––


Jessica J. Yeary, Public Defender, and Megan Long, Assistant Public Defender, Tallahassee, for Appellant.

James Uthmeier, Attorney General, and Steven E. Woods, Assistant Attorney General, Tallahassee, for Appellee.